United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued in banc May 13, 1998 Decided October 9, 1998

 No. 96-7089

 Etim U. Aka,

 Appellant

 v.

 Washington Hospital Center,

 Appellee

 Appeal from the United States District Court

 for the District of Columbia

 (No. 94cv01281)

 Gregg D. Adler argued the cause for appellant, with whom 
James L. Kestell was on the briefs.

 Stewart S. Manela argued the cause for appellee, with 
whom Henry Morris, Jr., and Anne M. Hamilton were on 
the briefs. Samuel K. Charnoff entered an appearance.

 Barbara L. Sloan, Attorney, Equal Employment Opportu-
nity Commission, argued the cause for amicus curiae, with 
whom Lorraine C. Davis, Assistant General Counsel, was on 
the briefs. Philip B. Sklover, Associate General Counsel, 
entered an appearance.

 Before: Edwards, Chief Judge, Wald, Silberman, Williams, 
Ginsburg, Sentelle, Henderson, Randolph, Rogers, Tatel and 
Garland, Circuit Judges.
 Opinion for the Court filed by Circuit Judge Wald.

 Dissenting Opinion filed by Circuit Judge Henderson, with 

whom Silberman, Williams and Ginsburg, Circuit Judges, 
join.

 Dissenting Opinion filed by Circuit Judge Silberman, with 

whom Williams and Ginsburg, Circuit Judges, join.

 Wald, Circuit Judge: In 1991, Etim U. Aka ("Aka") under-
went heart bypass surgery, and thereafter was unable to 
perform his prior job as an orderly at Washington Hospital 
Center ("WHC"). After several of his applications for vacant 
positions at WHC were turned down, he sued WHC in the 
United States District Court for the District of Columbia, 
claiming that WHC in its hiring decisions had discriminated 
against him on the basis of his age and disability, and that 
WHC had also violated the Americans with Disabilities Act of 
1990, 42 U.S.C. s 12101 et seq., ("the ADA") by failing to 
reasonably accommodate his disability by reassigning him to 
a vacant position. The district court granted summary judg-
ment to WHC, and Aka appealed; a divided panel of this 
court vacated the summary judgment as to one of the hiring 
decisions and as to Aka's reasonable-accommodation claim. 
At the behest of WHC, we granted rehearing in banc as to 
these two claims. We again vacate the original summary 
judgment on Aka's two claims, though for reasons that differ 
from the panel's in some respects.

 I. Background

 Aka, a 56-year-old man born and raised in Nigeria, began 
working for WHC as an Operating Room Orderly in 1972, two 

years after he emigrated from Nigeria. His job, which 
involved transporting patients and medical supplies to and 
from WHC's operating room, required substantial amounts of 
heavy lifting and pushing. While working at WHC, Aka 
earned a college degree from the University of Baltimore, and 
then a master's degree in business and public administration 
("MBPA") in health service management from Southeastern 
University.

 In 1991, after working at WHC for over nineteen years, 
Aka was hospitalized with heart and circulatory problems. 
He underwent bypass surgery in November 1991, and spent 
several months thereafter in rehabilitation. While he was in 
the hospital, a representative of WHC's personnel depart-
ment, at the request of a hospital social worker, visited Aka to 
discuss the possibility of his returning to work. Aka had 
obtained a medical leave of absence from WHC before his 
operation, and WHC now arranged for an extension of that 
leave. Aka was in rehabilitation until April 1992. His doctor 
then told him he could return to work, with a warning that his 
job could not involve more than a "light or moderate level of 
exertion."

 Aka's former orderly job did not meet that qualification; 
thus, Aka asked the hospital to transfer him to a job that was 
compatible with his medical restrictions.1 WHC declined to 
do so, and instead told him that it was his responsibility to 
review WHC's job postings and to apply for any vacant jobs 
that interested him. WHC did, however, put Aka on an 
eighteen-month "job search leave." The applicable collective 
bargaining agreement ("CBA") provides that qualified WHC 
employees "will be given preferential treatment over non-
Hospital employees in filling bargaining unit vacancies," and 
also incorporates an additional preference for employees with 
greater seniority. WHC's decision to place Aka on job search 

__________
 1 Aka also explained to WHC that he wished to remain employed 
at the hospital in some capacity because he had a retirement plan 
and other benefits which he might lose if he had to leave.


leave meant that Aka could retain these preferences during 
the leave period.

 Aka first applied for a position as a Financial Manager, but 
was not given an interview. An employee of WHC's person-
nel department told him to apply for less elevated positions, 
and specifically suggested the positions of File Clerk and Unit 
Clerk. Aka followed this advice, and applied in May 1993 for 
a position as Central Pharmacy Technician, a job that in-
volved a range of clerical tasks associated with filling pre-
scriptions, such as patient census checks, charge processing, 
and stock replacement. Dr. Ann Breakenridge ("Breaken-
ridge"), WHC's Assistant Director of Pharmacy Clinical Ser-
vices, interviewed Aka for this job, but hired another hospital 
employee, Jaime Valenzuela ("Valenzuela"), instead.

 In July 1993, four vacancies opened up for File Clerk 
positions. Aka again applied and was interviewed, but did 
not get any of the four jobs. Among the four applicants who 
were hired were two non-WHC employees. Aka, believing 
that this violated the CBA's requirement that hospital em-
ployees be accorded preference in filling empty positions, 
complained to the union, and the union filed a grievance on 
behalf of Aka and another hospital employee. While this 
grievance was in arbitration, WHC admitted its mistake, 
removed the two non-employees from the File Clerk jobs, and 
hired two hospital employees instead; it did not, however, 
hire Aka. Aka then protested that he should have been 
among those hired, given his greater seniority. The arbitra-
tor ultimately ruled (in November 1994) that WHC's decision 
not to hire Aka did not violate the CBA. The arbitrator 
found that Aka met the minimal qualifications for the job, had 
"excellent" evaluations and "good marks" for his ability to 
work with peers, and was a "highly intelligent and motivated 
man" who "could be expected to grasp the technical aspects of 
the job quite readily." Nevertheless, he said, the CBA allows 
WHC to hire less senior applicants if they are more qualified, 
and the applicants WHC hired for the File Clerk jobs had 
substantial experience with office work, which Aka did not.


 In the meantime, Aka continued to apply for other positions 
at the hospital, but did not receive interviews for any of them. 
(He eventually volunteered to do administrative work in 
various parts of the hospital, but still did not succeed in 
obtaining a job.) In June 1994, Aka filed suit in the United 
States District Court for the District of Columbia. He 
claimed that WHC's failure to place him in the Central 
Pharmacy Technician or File Clerk jobs constituted discrimi-
nation on the basis of his disability and age, in violation of the 
Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. 
ss 621-34 (1994), and the Americans with Disabilities Act 
("ADA"), 42 U.S.C. s 12101 et seq. (1994).2

 WHC initially moved to dismiss the complaint, arguing that 
Aka was required to exhaust the CBA's grievance procedures; 
this motion was denied. Then, after discovery, WHC moved 
for summary judgment as to Aka's disparate treatment 
claims, which invoke WHC's failure to hire him for any of the 
jobs he applied for; the district court granted this motion. 
Aka cross-moved for summary judgment as to WHC's failure 
to reasonably accommodate his disability, asserting that, un-
der the ADA, WHC was obliged to reassign him to a vacant 
position for which he was qualified and which he could 
perform despite his disability. As to his reasonable-
accommodation claim, the district court concluded that the 
CBA barred WHC from reassigning disabled employees out-
side of the usual job-application process provided for in the 
CBA, and that any reassignment obligation under the ADA 
must give way if it conflicts with other employees' rights 
under the CBA. The district court thus granted summary 
judgment to WHC on this issue as well.

 Aka appealed the denial of both the ADEA and the ADA 
claims. A panel of this court concluded that the district court 

__________
 2 Aka originally also claimed that WHC had (1) discriminated 
against him on the basis of his national origin in violation of Title 
VII of the Civil Rights Act of 1964, 42 U.S.C. s 2000e et seq. (1994), 
and (2) violated the District of Columbia Family and Medical Leave 
Act, D.C. Code Ann. s 36-1301 et seq. He has subsequently 
dropped these claims.

had correctly granted summary judgment to WHC as to 
Aka's disparate-treatment claim based on the File Clerk 
hiring decisions. As to the remainder of Aka's claims, the 
panel was in disagreement. The majority reversed and re-
manded as to the grant of summary judgment to WHC on (1) 
Aka's disparate-treatment claim based on the Central Phar-
macy Technician hiring decision and (2) Aka's reasonable-
accommodation claim. The dissent would have affirmed as to 
the first of these claims, and would have remanded on differ-
ent grounds as to the second. WHC moved for rehearing in 
banc as to these two rulings, which was granted. (Neither 
WHC nor Aka asked that the panel's holding as to the File 
Clerk positions be reheard in banc, so that the panel's ruling 
on that issue stands.) We conclude that it was error for the 
district court to grant summary judgment to WHC as to 
Aka's Central Pharmacy Technician disparate-treatment 
claim and as to his reasonable-accommodation claim.

 II. Analysis

 The principles of summary judgment are sufficiently famil-
iar as to require only brief restatement. We review grants of 
summary judgment de novo; a party is only entitled to 
summary judgment if the record, viewed in the light most 
favorable to the nonmoving party, reveals that there is no 
genuine issue as to any material fact. See Tao v. Freeh, 27 
F.3d 635, 638 (D.C. Cir. 1994). "[S]ummary judgment will 
not lie if ... the evidence is such that a reasonable jury could 
return a verdict for the nonmoving party." Anderson v. 
Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

 In addition to his age discrimination claim, Aka in effect 
makes two distinct disability discrimination claims. The first 
is based on the theory that WHC engaged in disparate 
treatment in declining to hire him for the Pharmacy Techni-
cian position; the second, on the theory that WHC discrimi-
nated against him in declining to grant him the reasonable 
accommodation of reassignment to a vacant position once he 
became disabled. We will first analyze Aka's disparate treat-
ment disability discrimination claim (together with his age 


discrimination claim) under the familiar three-part protocol 
set forth by the Supreme Court in McDonnell Douglas Corp. 
v. Green, 411 U.S. 792 (1973). See DeLuca v. Winer Indus., 
Inc., 53 F.3d 793, 797 (7th Cir. 1995) (finding that the 
McDonnell Douglas framework applies to ADA cases); see 
also Barth v. Gelb, 2 F.3d 1180, 1186 (D.C. Cir. 1993) (finding 
that in cases under a related statute, the Rehabilitation Act, it 
is appropriate to apply the McDonnell Douglas framework to 
claims that an employer has acted with discriminatory intent). 
We then consider Aka's reasonable-accommodation claim, 
which is not subject to analysis under McDonnell Douglas, 
but has its own specialized legal standards. Cf. Barth, 2 F.3d 
at 1186 (drawing a similar distinction under the Rehabilitation 
Act).

A.Disparate Treatment

 Under the McDonnell Douglas framework, the complainant 
must first establish a prima facie case of prohibited discrimi-
nation. See McDonnell Douglas, 411 U.S. at 802. Once he 
has done so, the burden then shifts to the employer to 
articulate legitimate, nondiscriminatory reasons for the chal-
lenged employment decision. See id. Should the employer 
succeed in presenting such reasons, the burden then shifts 
back to the complainant, who then has an opportunity to 
discredit the employer's explanation. See id. at 804-05.3 In 
Texas Department of Community Affairs v. Burdine, 450 
U.S. 248 (1981), the Court held that, in producing nondiscrim-
inatory reasons for its challenged action, the employer is not 

__________
 3 McDonnell Douglas actually said the employee "must ... be 
afforded a fair opportunity to show that petitioner's stated reason 
for respondent's rejection was in fact pretext." 411 U.S. at 804. 
The term "pretext" can be slippery; sometimes it means that an 
employer's explanation is incorrect, and sometimes it means both 
that the explanation is incorrect and that the employer's real reason 
was discriminatory. (As we explain below, the plaintiff's ultimate 
obligation, under McDonnell Douglas and its progeny, is to show 
the latter.) We will avoid using the term "pretext," and instead 
refer (as appropriate) to evidence that the employer's explanation is 
false, that it is a lie, or that the employer's real motivation was 
discriminatory.

obligated to support these reasons with objective evidence 
sufficient to satisfy the "preponderance of the evidence" 
standard, see id. at 259-60, and that the plaintiff at all times 
retains the ultimate burden of persuasion. See id. at 253.

 The Court elaborated further on the McDonnell Douglas 
framework in St. Mary's Honor Center v. Hicks, 509 U.S. 502 
(1993). In that case, the plaintiff, Melvin Hicks, claimed that 
he had been fired because of his race. The district court 
found, after a bench trial, that he made out a prima facie case 
and the reasons proffered by the employer for firing Hicks 
were not its real reasons; the court concluded, however, that 
other evidence undercut the employee's claim that the firing 
was motivated by discrimination. The Eighth Circuit re-
versed, ruling that once the district court had found that the 
employer's proffered reasons for its decision were incorrect, 
there was no need to go further, and Hicks was entitled to 
judgment in his favor. The Supreme Court disagreed, hold-
ing that a plaintiff who discredits the employer's stated 
reasons for its employment decision is not necessarily entitled 
to judgment in his favor as a matter of law.

 We review Hicks in some detail, as the Court's most recent 
explication of the workings of the McDonnell Douglas frame-
work. Hicks made clear that the function of the prima facie 
case is to compel the employer to " 'produc[e] evidence' that 
the adverse employment actions were taken 'for a legitimate, 
nondiscriminatory reason.' " Id. at 507 (quoting Burdine, 450 
U.S. at 254). Once the employer has done so, "the presump-
tion [of discrimination] raised by the prima facie case is 
rebutted," and "drops from the case." Id. (quoting Burdine, 
450 U.S. at 255 & n.10). Then, the plaintiff has " 'the full and 
fair opportunity to demonstrate,' through presentation of his 
own case and through cross-examination of the defendant's 
witnesses, 'that the proffered reason was not the true reason 
for the employment decision,' and that race [or some other 
discriminatory basis] was." Id. at 507-08 (quoting Burdine, 
450 U.S. at 256) (citation omitted).

 Assuming then that the employer has met its burden of 
producing a nondiscriminatory reason for its actions, the 


focus of proceedings at trial (and at summary judgment) will 
be on whether the jury could infer discrimination from the 
combination of (1) the plaintiff's prima facie case; (2) any 
evidence the plaintiff presents to attack the employer's prof-
fered explanation for its actions; and (3) any further evidence 
of discrimination that may be available to the plaintiff (such 
as independent evidence of discriminatory statements or atti-
tudes on the part of the employer) or any contrary evidence 
that may be available to the employer (such as evidence of a 
strong track record in equal opportunity employment). That 
is not to say that every plaintiff must always present evidence 
in each of these categories in order to avoid summary judg-
ment.4 In this case, Aka has presented evidence in the first 
two categories, but neither Aka nor WHC has presented any 
evidence in the third. We are therefore faced with the issue 
of when evidence in categories (1) and (2) alone can suffice to 
support a jury verdict for the plaintiff, or, as in this case, to 
prevent summary judgment for the defendant.

 A number of circuit courts have cited Hicks for the proposi-
tion that a plaintiff can always succeed in fending off sum-
mary judgment if he can demonstrate a genuine issue of 
material fact as to whether the employer's stated reason for 
its employment decision is the real reason. See, e.g., Sheri-
dan v. E.I. DuPont de Nemours & Co., 100 F.3d 1061, 1066-
72 (3d Cir. 1996) (in banc); Kline v. Tennessee Valley Auth., 
128 F.3d 337, 342-47 (6th Cir. 1997); Anderson v. Baxter 
Healthcare Corp., 13 F.3d 1120, 1123-24 (7th Cir. 1994); 
Washington v. Garrett, 10 F.3d 1421, 1433 (9th Cir. 1993); 
Randle v. City of Aurora, 69 F.3d 441, 451 (10th Cir. 1995). 
Other circuit courts have disagreed with this reading of 
Hicks, saying that there are at least some situations in which 
genuine issues of material fact as to the falsity of the employ-
er's explanation will not suffice alone to avoid summary 

__________
 4 Indeed, Burdine said that in some cases the plaintiff may be 
able to prevail on the basis of his initial prima facie case alone, 
"combined with effective cross-examination of the defendant." Bur-
dine, 450 U.S. at 255 n.10. This suggests that a prima facie case 
that strongly suggests intentional discrimination may be enough by 
itself to survive summary judgment.

judgment. See, e.g., Hidalgo v. Conado Insurance Agencies, 
Inc., 120 F.3d 328, 335-37 (1st Cir. 1997); Fisher v. Vassar 
College, 114 F.3d 1332, 1335-38 (2d Cir. 1997) (in banc);5 
Rhodes v. Guiberson Oil Tools, 75 F.3d 989, 994 (5th Cir. 
1996) (in banc); Ryther v. Kare 11, 108 F.3d 832, 836-37 (8th 
Cir. 1997) (in banc).

 We ourselves do not read Hicks to say that a plaintiff who 
creates a genuine issue of material fact as to whether the 
employer has given the real reason for its employment deci-
sion will always be deemed to have presented enough evi-
dence to survive summary judgment. Instead, the court 
must consider all the evidence in its full context in deciding 
whether the plaintiff has met his burden of showing that a 
reasonable jury could conclude that he had suffered discrimi-
nation and accordingly summary judgment is inappropriate. 
Under Hicks and other applicable law, however, a plaintiff's 

__________
 5 We do not see the difference that Judge Silberman discerns 
between our approach and that of the Second Circuit in Fisher. To 
the contrary we view our approach as in accord with that of our 
Second Circuit colleagues. Fisher holds that "evidence constituting 
a prima facie case prior to the employer's proffer of a reason, 
coupled with the error or falsity of the employer's proffered reason 
may--or may not--be sufficient to show illegal discrimination by a 
preponderance of the evidence." 114 F.3d at 1333. Fisher further 
holds that "the fact that the proffered reason was false does not 
necessarily mean that the true motive was the illegal one argued by 
the plaintiff.... The sufficiency of the finding of pretext to 
support a finding of discrimination depends on the circumstances of 
the case." Id. at 1338 (emphasis added). Neither our decision, nor 
that of the Second Circuit is in conflict with Judge Silberman's view 
that the prima facie case "is only a burden of production shifting 
device," infra at 4 (Silberman, J., dissenting). Indeed, we make 
precisely the same point in our description of the McDonnell 
Douglas framework, supra at 8; as we explain below, once the 
burden-shifting process is complete, the evidence constituting the 
prima facie case is then weighed, together with the parties' other 
evidence, according to ordinary evidentiary principles. See infra 
s II.A.2. In sum, neither our decision, nor that in Fisher, 
"amounts, de facto, to a broad 'wrongful discharge' cause of action 

discrediting of an employer's stated reason for its employ-
ment decision is entitled to considerable weight. As we will 
explain, we therefore reject any reading of Hicks under which 
employment discrimination plaintiffs would be routinely re-
quired to submit evidence over and above rebutting the 
employer's stated explanation in order to avoid summary 
judgment.

 1.The meaning of Hicks
 The principal support for the proposition that a plaintiff can 
always avoid summary judgment by creating a genuine issue 
of material fact as to whether the employer's stated reason 
for its employment decision is the true reason derives from 
the following passage in Hicks:

 The factfinder's disbelief of the reasons put forward by 
 the defendant (particularly if disbelief is accompanied by 
 a suspicion of mendacity) may, together with the ele-
 ments of the prima facie case, suffice to show intentional 
 discrimination. Thus, rejection of the defendant's prof-
 fered reasons will permit the trier of fact to infer the 
 ultimate fact of intentional discrimination,4 and the Court 
 of Appeals was correct when it noted that, upon such 
 rejection, no additional proof of discrimination is re-
 quired. But the Court of Appeals' holding that rejection 
 of the defendant's proffered reasons compels judgment 
 for the plaintiff disregards the fundamental principle of 
 Rule [of Evidence] 301 that a presumption does not shift 
 the burden of proof, and ignores our repeated admonition 
 that the Title VII plaintiff at all times bears the 'ultimate 
 burden of persuasion.'
__________

 4 Contrary to the dissent's confusion-producing analysis, there 
 is nothing whatsoever inconsistent between this statement and 
 our later statements that (1) the plaintiff must show "both that 
 the reason was false, and that discrimination was the real 
 reason," and (2) "it is not enough ... to disbelieve the employ-
 er." Even though (as we say here) rejection of the defendant's 
 proffered reasons is enough at law to sustain a finding of 
 discrimination, there must be a finding of discrimination.

__________
for a plaintiff in a protected class," infra at 3 (Silberman, J., 
dissenting).

Hicks, 509 U.S. at 511 (emphasis and ellipsis in original) 
(citations omitted). Certainly, this passage indicates at a 
minimum that a factfinder's reasonable rejection of the defen-
dant's proffered explanation will support an inference of 
discrimination. But this passage can be and has been read 
by some courts to go further, proclaiming that if the jury can 
reasonably reject the defendant's proffered reason, no addi-
tional proof of discrimination is ever "required." See, e.g., 
Anderson, 13 F.3d at 1123-24; Washington, 10 F.3d at 1433. 
For reasons discussed below, common sense compels us to 
reject so broad a reading. The Court's every word and 
sentence cannot be read in a vacuum; its pronouncements 
must be read in light of the holding of the case and to the 
degree possible, so as to be consistent with the Court's 
apparent intentions and with other language in the same 
opinion. As the Court itself cautions elsewhere in Hicks, "we 
think it generally undesirable, where holdings of the Court 
are not at issue, to dissect the sentences of the United States 
Reports as though they were the United States Code." Id. at 
515.

 Two examples illustrate why we believe an unqualifiedly 
literal reading of this passage of Hicks would not carry out 
the Court's true purpose. First, let us consider a case in 
which the plaintiff calls the employer's explanation into ques-
tion, but does so in a way that conclusively demonstrates that 
the real explanation for the employer's behavior is not dis-
crimination, but some other motivation. For instance, in 
Rothmeier v. Investment Advisers, Inc., 85 F.3d 1328 (8th 
Cir. 1996), the plaintiff claimed that he had been fired be-
cause of his age. When his former employer came forward 
with a number of nondiscriminatory explanations, including 
insubordination, the plaintiff responded with evidence that in 
fact the real reason he had been discharged was that he had 
discovered that his firm was not in compliance with Securities 
and Exchange Commission rules and his employer wished to 
cover the problem up--a contention that the panel rightly 
concluded undercut the plaintiff's own claim of age discrimi-
nation. See id. at 1337-38; cf. Hazen Paper v. Biggins, 507 
U.S. 604, 613 (1993) (noting that "inferring age motivation 


from the implausibility of the employer's explanation may be 
problematic in cases where other unsavory motives, such as 
pension interference, were present."). If a plaintiff shoots 
himself in the foot, surely there is no point in sending the 
case to the jury. See also Visser v. Packer Engineering 
Assoc., 924 F.2d 655, 657 (7th Cir. 1991) (in banc) (observing 
that a plaintiff's evidence that he was fired because he was a 
whistleblower does not tend to show discrimination, and 
"tends if anything to show the opposite").

 Second, there may be no legitimate jury question as to 
discrimination in a case in which a plaintiff has created only a 
weak issue of material fact as to whether the employer's 
explanation is untrue, and there is abundant independent 
evidence in the record that no discrimination has occurred. 
The Hicks Court cited the example of a situation in which the 
hiring officer, as well as 40% of the employer's work force, 
were members of the same minority group as the plaintiff 
(even though the group in question comprised only 10% of the 
relevant labor market). See Hicks, 509 U.S. at 513. Where 
an employer has a strong record of equal opportunity employ-
ment, any inference of discrimination arising from the dis-
crediting of the employer's explanation may be a weak one, 
and in some cases not strong enough to let a reasonable 
factfinder conclude that discrimination has occurred at all.

 Accordingly, as we read Hicks, the plaintiff's attack on the 
employer's explanation must always be assessed in light of 
the total circumstances of the case; in some instances, as we 
have pointed out, the fact that there are material questions as 
to whether the employer has given the real explanation will 
not suffice to support an inference of discrimination. It is 
obviously impossible to provide an exhaustive list of such 
situations. In the next section, however, we discuss the 
(often great) evidentiary weight to be accorded to the plain-
tiff's exposure of the defendant's excuse as false, an analysis 
that will assist in determining whether a particular showing 
suffices to permit an inference of discrimination.

 Although we find that rebuttal evidence alone will not 
always suffice to permit an inference of discrimination, we do 


not endorse a reading of Hicks under which employment 
discrimination plaintiffs are presumptively required to submit 
evidence over and above such a rebuttal in order to avoid 
summary judgment. An example of a case adopting the 
latter approach is Hidalgo v. Overseas Condado Ins. Agen-
cies, Inc., 120 F.3d 328 (1st Cir. 1997). In Hidalgo, the First 
Circuit assumed for purposes of its decision that an age-
discrimination plaintiff had raised a triable issue as to wheth-
er the employer's explanation was incorrect,6 but nevertheless 
concluded that because the plaintiff had "offered no evidence 
that reasonably could be construed to indicate that [the 
employer] intended to discriminate against him because of his 
age," it was appropriate to grant summary judgment for the 
defendant. Id. at 337. As we have said, the circumstances of 
some cases may render evidence undercutting the employer's 
explanation insufficient to infer discrimination; but Hidalgo, 
rather than explaining why the showing in that case fell short, 
simply said that the plaintiff had offered "no" evidence of 
intentional discrimination, without addressing the significance 
of the plaintiff's case at all. This suggests that the Hidalgo 
court believed that employment-discrimination plaintiffs must 
as a routine matter do more than discredit the employer's 
explanation in order to avoid summary judgment. That 
assumption we think would be inconsistent with Hicks, which 
makes clear that "no additional proof of discrimination is 
required" as a matter of course once a plaintiff has shown 
that a jury could reject the employer's proffered explanation. 
Hicks, 509 U.S. at 511; see also Rothmeier, 85 F.3d at 1333-
35 (reading Hicks to reject an approach under which a 
showing that the defendant's proffered explanation is false is 
presumptively insufficient to show discrimination); Anderson, 
13 F.3d at 1123 (same);7 cf. Rhodes, 75 F.3d at 993 (saying 

__________
 6 Hidalgo actually uses the term "pretext." Id. at 337. In 
context, it is apparent that the court meant this term in the sense of 
"incorrect."

 7 Both Anderson and Rothmeier make this point by saying that 
Hicks rejected the so-called "pretext-plus" standard that had been 
applied by some circuit courts. We have not used the term 
"pretext-plus," as it obscures the distinction between (1) requiring 

that evidence showing the employer's explanation to be false, 
standing alone, will "ordinarily" permit an inference of dis-
crimination). Our reading of Hicks also accords with the 
Supreme Court's rule, set forth in United States Postal Serv. 
v. Aikens, 460 U.S. 711, 714 n.3, 717 (1983), that it is improper 
to require plaintiffs to produce direct evidence of discrimina-
tory intent in order to prevail at trial.

 2.The weight to be assigned to the plaintiff's rebuttal

 Although the plaintiff cannot always avoid summary judg-
ment by showing the employer's explanation to be false, we 
read Hicks (and other relevant caselaw) to mean that such a 
showing does have considerable evidentiary significance. 
First, when the plaintiff rebuts the employer's own explana-
tion of its challenged acts, this eliminates the principal non-
discriminatory explanation for the employer's actions. 
Events have causes; if the only explanations set forth in the 
record have been rebutted, the jury is permitted to search for 
others, and may in appropriate circumstances draw an infer-
ence of discrimination. As the Court said in Furnco Con-
struction Corp. v. Waters, 438 U.S. 567 (1978):

 A prima facie case under McDonnell Douglas raises an 
 inference of discrimination only because we presume 
 these acts, if otherwise unexplained, are more likely than 
 not based on the consideration of impermissible factors. 
 And we are willing to presume this largely because we 
 know from our experience that more often than not 
 people do not act in a totally arbitrary manner, without 
 any underlying reasons, especially in a business setting. 

__________
that plaintiffs both discredit the employer's explanation and show 
discrimination, and (2) presumptively requiring that plaintiffs pro-
vide more than discrediting evidence alone in order to show discrim-
ination. Both Anderson and Rothmeier read Hicks, as do we, to 
adopt the first of these two approaches, but reject the second. See 
generally Catherine J. Lanctot, The Defendant Lies and the Plain-
tiff Loses: The Fallacy of the "Pretext-Plus" Rule in Employment 
Discrimination Cases, 43 Hastings L.J. 57 (1991) (explaining why it 
is inappropriate routinely to require plaintiffs to adduce more 
evidence than rebuttal evidence alone).

 Thus, when all legitimate reasons for rejecting an appli-
 cant have been eliminated as possible reasons for the 
 employer's actions, it is more likely than not the employ-
 er, who we generally assume acts with some reason, 
 based his decision on an impermissible consideration 
 such as race.

Id. at 577 (citations omitted). In this passage the Court was 
explaining why it is permissible to grant judgment for the 
plaintiff on the basis of an unrebutted prima facie case: 
because, in the absence of a legitimate explanation, we infer 
the existence of an illegitimate one. Similarly when the 
plaintiff has discredited the employer's explanation for its 
acts, and no other plausible explanation is readily at hand, 
Furnco's logic would seem to apply as well, and to at least 
permit (if not compel, as in Furnco) an inference of discrimi-
nation in an appropriate case.

 If the jury can infer that the employer's explanation is not 
only a mistaken one in terms of the facts, but a lie, that 
should provide even stronger evidence of discrimination. As 
Hicks said, "[t]he factfinder's disbelief of the reasons put 
forward by the defendant (particularly if disbelief is accom-
panied by a suspicion of mendacity) may, together with the 
elements of the prima facie case, suffice to show intentional 
discrimination." 509 U.S. at 511 (emphasis added). This is 
so because, according to ordinary evidentiary principles 
(which we have been instructed to apply in employment 
discrimination cases, see Aikens, 460 U.S. at 716), a lie is 
evidence of consciousness of guilt. The jury can conclude 
that an employer who fabricates a false explanation has 
something to hide; that "something" may well be discrimina-
tory intent. See Shager v. Upjohn Co., 913 F.2d 398, 401 (7th 
Cir. 1990) ("If the only reason an employer offers for firing an 
employee is a lie, the inference that the real reason was a 
forbidden one ... may rationally be drawn"); Wallace v. 
SMC Pneumatics, Inc., 103 F.3d 1394, 1400 (7th Cir. 1997).

 Such an inference is of course in line with how evidence of 
consciousness of guilt is treated in other cases, criminal or 
civil. An employer that concocts a false explanation for an 


employment decision is in a like position to a criminal defen-
dant who offers a false alibi: the jury may consider the fact 
that the defendant has presented a false alibi in deciding his 
guilt. See United States v. Hughes, 716 F.2d 234, 240-41 (4th 
Cir. 1983); United States v. Zang, 703 F.2d 1186, 1191 (10th 
Cir. 1982). In this circuit, we have repeatedly treated false 
statements by a defendant as credible evidence of conscious-
ness of guilt. See, e.g., United States v. Morgan, 914 F.2d 
272, 276 (D.C. Cir. 1990) (per curiam) (citing a defendant's lie 
about possessing a claim check for a suitcase containing drugs 
in assessing the sufficiency of the evidence); see also United 
States v. Johnson, 46 F.3d 1166, 1171 (D.C. Cir. 1995) (finding 
it appropriate to admit as evidence of consciousness of guilt a 
drug defendant's false claim, made to explain the source of his 
income, that he worked at a sporting goods store).

 Of course, as the Court explained in Hicks, an employer's 
lie does not automatically entitle the plaintiff to judgment as a 
matter of law. But Hicks also made plain that a lie "carries 
substantial risks," including the risk of sanctions, Hicks, 509 
U.S. at 521-22, and the more mundane risk that the lie will 
lead the jury to draw an adverse inference. Indeed, the 
employer's fear that the jury will draw an adverse inference 
from a false explanation is a vital element of the McDonnell 
Douglas burden-shifting procedure. Without it, employers 
would have little incentive to look for and present the real 
reasons for their employment decisions, undercutting the 
purpose of the McDonnell Douglas framework, which is "to 
compensate for the fact that direct evidence of intentional 
discrimination is hard to come by." Price Waterhouse v. 
Hopkins, 490 U.S. 228, 271 (1989) (O'Connor, J., concurring); 
see also TWA v. Thurston, 469 U.S. 111, 121 (1985).8

__________
 8 The dissent observes that an employer may offer a lie to explain 
its actions, not because it has discriminated but because it wishes to 
conceal an "embarrassing, albeit lawful" motive, or "to spare the 
feelings of an employee he considered unsatisfactory in perfor-
mance." Dissenting opinion at 3 n.3. Possibly; but the fact that a 
lie could have multiple explanations, some of them well-intentioned, 
cannot and should not foreclose the finder of fact, after hearing 
witness testimony and assessing the evidence as a whole, from 

 To summarize, we can do no better than to quote Hicks 
once more. In an appropriate case, "[t]he factfinder's disbe-
lief of the reasons put forward by the defendant" will allow it 
to infer intentional discrimination. 509 U.S. at 511. (As we 
observe above, it is difficult, if not impossible, to say in any 
concise or generic way under what precise circumstances such 
an inference will be inappropriate.9) If "disbelief is accompa-
nied by a suspicion of mendacity," id., the likelihood of 
intentional discrimination is increased, permitting the 
factfinder to infer discrimination more readily.

__________
deciding that the real motivation for lying was not innocent, but 
discriminatory. (This is subject, of course, to the ability of the 
courts to review any factual findings. See Hicks, 509 U.S. at 524.)

 9 Our dissenting colleagues cite this acknowledgement in accusing 
us of advancing a "framework (if one can call it that) that is both 
devoid of intelligible standards and incompatible with the principle 
that the plaintiff bears the burden of proof on the ultimate fact." 
Dissenting opinion at 7. But the task of assessing whether a 
plaintiff has presented enough evidence to permit an inference of 
discriminatory intent is, as the author of the dissent herself ob-
served in her panel dissent, "intensely fact bound." See Aka v. 
Washington Hospital Center, 116 F.3d 876, 899 (D.C. Cir. 1997) 
(Henderson, J., dissenting). Accordingly we have limited ourselves 
to identifying the general principles that govern the plaintiff's 
burden on summary judgment and to providing a detailed applica-
tion of those principles to this case. The dissent appears to offer no 
analytical framework of its own. Because the Supreme Court has 
made clear that it is improper to require direct proof of discrimina-
tory intent, see Aikens, 460 U.S. at 714 n.3, 717, it must be possible 
for a plaintiff to survive summary judgment in some cases by 
showing that the defendant's explanation is a lie. The dissent 
conspicuously fails, however, to identify those cases in which such 
an inference is possible and those in which it is not. And as to the 
dissent's claim that our approach is "incompatible with the principle 
that the plaintiff bears the burden of proof on the ultimate fact," 
our entire analysis focuses on the precise question of when a jury 
might reasonably conclude that the plaintiff's evidence suffices to 
meet that burden.

 3.The evidence in this case

 The conflict of evidence in Aka's case involves, in large 
part, a dispute over job qualifications, his and those of the 
successful contender for the Pharmacy Technician job. WHC 
claims that it hired Valenzuela because he was more qualified 
than Aka. Aka replies that WHC is mistaken as to their 
comparative qualifications, and that it was he, Aka, who was 
more qualified for the position.

 In cases involving a comparison of the plaintiff's qualifica-
tions and those of the successful candidate, we must assume 
that a reasonable juror who might disagree with the employ-
er's decision, but would find the question close, would not 
usually infer discrimination on the basis of a comparison of 
qualifications alone. In a close case, a reasonable juror would 
usually assume that the employer is more capable of assess-
ing the significance of small differences in the qualifications of 
the candidates, or that the employer simply made a judgment 
call. Cf. Combs v. Plantation Patterns, 106 F.3d 1519, 1543 
(11th Cir. 1997). But this does not mean that a reasonable 
juror would in every case defer to the employer's assessment. 
If that were so, no job discrimination case could ever go to 
trial. If a factfinder can conclude that a reasonable employer 
would have found the plaintiff to be significantly better 
qualified for the job, but this employer did not, the factfinder 
can legitimately infer that the employer consciously selected a 
less-qualified candidate--something that employers do not 
usually do, unless some other strong consideration, such as 
discrimination, enters into the picture.10

 A plaintiff attacking a qualifications-based explanation is of 
course not limited to comparing his qualifications against 
those of the successful candidate. The plaintiff can instead 

__________
 10 An employer may of course select a candidate who on paper is 
less qualified for other reasons, such as subjective reactions that 
emerge in the interview. We discuss such subjective considerations 
below.


seek to expose other flaws in the employer's explanation. 
For example, the plaintiff can attempt to show that the 
employer's explanation was fabricated after the fact by show-
ing that it contradicts other contemporaneous accounts of the 
employer's decision. Or a plaintiff can attempt to show that 
the employer's explanation misstates the candidates' qualifica-
tions. Thus, if the employer says that it did not hire the 
plaintiff because he did not speak Portuguese, the plaintiff 
can show that he did speak Portuguese, and that the employ-
er knew it. Adequate evidence of this type may suffice to 
permit a jury to infer that the employer's explanation is 
incorrect or fabricated, and thus to infer discrimination.11

 A review of the evidence in this case reveals that a reason-
able factfinder could conclude both that the balance of qualifi-
cations weighed markedly in Aka's favor, and that there was 
other evidence calling WHC's explanation into question. 
Viewing the evidence "as favorably to [Aka] as reason will 
permit," Shager, 913 F.2d at 401, as we are obligated to do at 
summary judgment, we find that the evidence suffices for a 
reasonable factfinder to infer discrimination. We begin with 
a review of Aka's and Valenzuela's qualifications for the 
Central Pharmacy Technician position, and then turn to other 
evidence calling WHC's explanation into question.

 a.Aka's and Valenzuela's Qualifications

 WHC's official "position specification" form listed two qual-
ifications for the job, "previous hospital experience in phar-
macy services" and "knowledge of medical terminology." 
The listed job responsibilities are quite varied, and include 
accepting drug and narcotic orders, distributing medications, 
answering questions and giving directions to the public, main-

__________
 11 As we have already said, the plaintiff is not limited to challeng-
ing the employer's explanation, but can also avoid summary judg-
ment (and prevail at trial) by presenting other evidence, either 
direct or circumstantial, that permits an inference of discrimination. 
See Wallace, 103 F.3d at 1397. For instance, if a female plaintiff 
claims sex discrimination, evidence that the defendant employs 
women at rates far below their numbers in the applicant pool and 
the general population may well help her case.

taining narcotic control records and inventory books, per-
forming "charging" (that is, billing) functions, stocking phar-
maceutical and IV supplies, performing patient census 
checks, "evaluating, processing, and filling drug stock orders 
for satellite pharmacies," and "monitoring the pharmacy's ex-
temporaneous pre-pack list to identify items that should be 
pre-packaged." 12

 Aka's application form for the Central Pharmacy Techni-
cian position listed his current position, "OR Orderly," his 
hire date, August 6, 1972, and the highest degree he held, his 
MBPA in health service management. Aka was interviewed 
by Dr. Ann Breakenridge, WHC's Assistant Director of Phar-
macy Clinical Services. After the interview, Breakenridge 
wrote on a WHC Interview Summary Report form: "Mr. Aka 
is a longstanding WHC employee on MLOA [medical leave of 
absence]. Performed duties in the OR with some exposure to 
minimal pharmacy functions." Her assessment of Aka states: 
"Mr. Aka has no skills which will be helpful as a pharmacy 
technician. He is aware of the drug delivery aspect of the job 
which is a minor part of the technician responsibilities. 
Schedule [illegible] responsibilities [illegible]. Mr. Aka's 
MBPA degree could be best utilized in other areas of the 
hospital." In a later affidavit, she added that Aka had 
displayed no "enthusiasm" during the interview, and said 
"[i]ndeed he told me that he really was not interested in doing 
pharmacy work." Aka denies saying this.

 Valenzuela's application form said that he did not have a 
college degree, and that he had been working at the hospital 
laundry for slightly over a year; he listed his duties as 
"prepare clean linen for delivery," and said "when needed, I 
work in the folding machines and ironer." Valenzuela also 
said: "For two months I worked as volunteer in Asco Phar-
macy. My duties are pricing, stocking, filling up cassettes. I 

__________
 12 The last three of these items are not on the official list of job 
responsibilities that appears in the record, but are listed as respon-
sibilities in Breakenridge's affidavit.


pick up and deliver medicine from nursing units."13

 In explaining her decision to hire Valenzuela instead of 
Aka, Breakenridge cited Valenzuela's experience in pharmacy 
services, his knowledge of medical terminology, and his great-
er enthusiasm. We will begin by discussing the more objec-
tive aspects of the candidates' qualifications, and then turn to 
the question of their relative enthusiasm.

 i. Pharmacy experience. Valenzuela's pharmacy experi-
ence was limited to two months of part-time volunteer work. 
It is unclear how much time Valenzuela volunteered, as he 
apparently continued to work full-time at the hospital. There 
is no evidence that the volunteer work occurred in a hospital, 
as the WHC position specification form required; "Asco" 
Pharmacy does not suggest a hospital. His work involved: 
(1) "pricing" medication, not a task listed in the Pharmacy 
Technician job description; (2) delivering medication to nurs-
ing stations, something Aka also did; and (3) "stocking" and 
"filling up cassettes," which (assuming that "cassettes" are 
medicine containers) appear to correspond to a single item in 
the job description, "receive, count and store pharmaceutical 
supplies."

 Aka on the other hand had spent nineteen years picking up 
medicine and IV solutions from the central pharmacy for 
delivery at the OR. As Aka describes this work, it was not 
limited to picking up materials at a counter, but required him 
to move around within the pharmacy; pharmacy staff would 
show Aka the section of the pharmacy in which the item he 
wanted could be found, and he knew "where to pick it up." 
As Aka pointed out at his deposition, this meant that he 
effectively already knew how to move materials within the 
pharmacy itself:

 My experience was while working as an orderly, they 
 used to send me to the pharmacy to pick up medication 

__________
 13 His application form also said that he had worked for a total of 
six years as a courier, and for six months doing building and ground 
maintenance.

 needed in O.R. When I go there, they show me the 
 section [where] [t]hey put medication for O.R. I know 
 where to pick it up.... So I can take that as experience 
 in taking medication to any section of the unit if they 
 need it.

Appendix at 129 (emphasis added).14

 A reasonable jury could find that Aka's ability to do the 
less skilled parts of the pharmacy job was at least comparable 

__________
 14 Aka adds in an affidavit that he was also "regularly assigned" 
to "stock medications in the nurses work area, and even sometimes 
prepare orders for medications that were not in sufficient stock in 
the nurses work area," and "had extensive knowledge and back-
ground with the forms used by [the] pharmacy for filling medi-
cations." WHC argues that because Aka did not specifically men-
tion this experience at his deposition, he should not be able to raise 
it in a later affidavit. Aka was asked at his deposition: "Is my 
understanding of your testimony correct, that your experience in 
pharmacy services consists of transporting narcotics and drugs to 
and from the pharmacy," and answered "Yes"; counsel for WHC 
then asked "Is there any more experience that you had, other than 
that?" and Aka said "No other experience." It is not clear that 
Aka's later affidavit necessarily contradicts this testimony. It may 
be that the broad task of transporting medications which Aka 
mentioned at his deposition includes the sub-tasks of preparing an 
order form, then going to get the medications, and then stocking 
them in the nurses' work area. Or it may be that when Aka was 
asked about his "experience in pharmacy services," he described 
only the work he had done directly in a pharmacy, and not all of the 
pharmacy-related work he had ever done. As we explained in 
Pyramid Securities, Ltd. v. IB Resolution, Inc., 924 F.2d 1114, 1123 
(D.C. Cir. 1991), although the courts frown on a party's attempt to 
contradict previous testimony at summary judgment, "persuasive 
reasons" for a correction are "more likely to be available where the 
initial statement took the form of a deposition rather than [as in 
Pyramid Securities] an affidavit. A deponent may have been 
confused about what was being asked or have lacked immediate 
access to material documents." Id. at 1123 (citation omitted). In 
any event, because it is not clear on the present record that 
Breakenridge knew about Aka's involvement in stocking or ordering 

to Valenzuela's. Aka had been moving and handling pharma-
cy supplies for nineteen years, and knew the layout and 
routines at WHC's pharmacy. It would not have taken him 
long to pick up whatever stocking skills Valenzuela learned 
during his short stint of volunteer work. Valenzuela would 
likewise have needed some time to learn his way around 
WHC's pharmacy (and hospital pharmacies generally).

 As to the more skilled parts of the pharmacy job, like 
billing, accounting, tracking drugs and patients, and planning 
pharmacy operations, Aka had a very strong advantage. 
Aka's master's degree in business and professional adminis-
tration, with a concentration in health service management, 
would presumably have been very helpful with these tasks.15 
Valenzuela, by contrast, did not even have a college degree. 
Moreover, Aka had worked directly with patients at WHC for 
nineteen years, and so would have been familiar with many of 
the relevant hospital procedures.16 Valenzuela, with his year 
working in the hospital laundry, could not make this claim.

 ii. Medical terminology. Breakenridge also cited Valen-
zuela's knowledge of medical terminology, derived "from a job 

__________
pharmaceuticals, we do not rely on these elements of Aka's affida-
vit.

 15 The dissenters give no weight to Aka's superior education 
because there were no educational prerequisites listed in the job 
description. Dissenting opinion at 8. But reasonable employers do 
not ordinarily limit their evaluation of applicants to a mechanistic 
checkoff of qualifications required by the written job descriptions. 
Obviously, they will take additional credentials into account, if those 
credentials would prove useful in performing the job.

 16 The job description for Aka's orderly job lists a broad range of 
responsibilities, including transporting patients, maintaining equip-
ment in clean and operational order, and performing "clinical sup-
port activities," such as administering procedures, assisting with 
specimen collection, and patient preparation--all work that would 
have provided Aka with important background knowledge on the 
functioning of the hospital. Breakenridge, a fairly senior hospital 
employee, would presumably have been familiar with this spectrum 
of duties.

that he had held at Metpath, a medical laboratory." That job 
lasted somewhat over a year, and involved picking up medical 
specimens from nursing homes and doctors' offices and deliv-
ering them to a lab for analysis.

 Aka says in his affidavit that, during his many years of 
work as an orderly, "my duties ... required me to work 
closely with the health care personnel servicing patients," and 
he "knew how most of the medications were used by nurses in 
their care of patients." (Aka does not claim that he knew 
what considerations doctors took into account in prescribing 
medication, which would be implausible, but only how nurses 
administered them.) Aka thus had nineteen years of close 
experience with the administration of medications, and proba-
bly knew (for instance) the name and general function of 
many medications, and that certain of the medications were 
dangerous or required special handling. It is not clear 
whether Aka mentioned his familiarity with the uses of 
medications at his job interview. But Breakenridge, whose 
title was Assistant Director of Pharmacy Clinical Services, 
presumably knew enough about the functioning of the hospi-
tal to be aware that a highly experienced orderly would 
frequently see medications being used.17

 A reasonable juror could conclude that Valenzuela would 
have learned much less of the medical terminology relevant to 
the pharmacy job in his year at Metpath than Aka did in his 
nineteen years at WHC. Not only was Valenzuela's work 
experience shorter, but Valenzuela was handling medical spe-
cimens, while Aka was working directly with drugs.

__________
 17 When WHC asked him at his deposition about his pharmacy 
experience, Aka did not mention his knowledge of the uses of 
medications. See supra note 14. But he could not have been 
expected to do so, just as someone asked about his experience 
working in hardware stores would not necessarily be expected to 
talk about his extensive experience with the proper use of tools. In 
any case, we are principally concerned here with the candidates' 
knowledge of medical terminology, not their pharmacy experience.


 iii. Enthusiasm. Considerations of enthusiasm aside, a 
reasonable juror could therefore find that Aka was signifi-
cantly better qualified than Valenzuela for the pharmacy job. 
This leaves Breakenridge's conclusion that Valenzuela was a 
highly enthusiastic candidate, and that Aka was not. There is 
evidence in the record to support the conclusion that each of 
the two candidates was enthusiastic. Valenzuela's pharmacy 
volunteer work points to enthusiasm (perhaps more than to 
actual experience). Breakenridge also noted that Valenzuela 
had applied for the pharmacy job once before and been 
rejected, so that he had demonstrated some previous interest 
in the job.18

 Aka claims that he, too, expressed enthusiasm at his inter-
view (contradicting Breakenridge's claim that he said that he 
did not want the job). A juror could find that the circum-
stances corroborate this claim. Aka had earned two degrees 
while working a full-time job, and was described by the 
arbitrator adjudicating the dispute over the File Clerk jobs as 
a "highly intelligent and motivated man." He applied for 
numerous jobs at WHC, despite being repeatedly turned 
down; indeed, in early 1995 he started volunteering in admin-
istrative jobs in various parts of the hospital, in an effort to 
enhance his chances of being hired.

 Of course, even if Aka was truly enthusiastic about the job, 
Breakenridge could still have subjectively concluded that he 
showed, in her words, "no enthusiasm for or interest in the 
Pharmacy Technician job." However, we are reluctant to 
give this possibility too much weight at summary judgment. 
First, Breakenridge did not comment at all on Aka's enthusi-

__________
 18 Actually, Breakenridge's affidavit said that it was "Plaintiff"--
Aka--who had previously applied for the pharmacy job and been 
turned down. Aka does not make this claim in his affidavit, 
however, and in context it seems likely that Breakenridge meant to 
refer to Valenzuela, who is otherwise the subject of the relevant 
paragraph. The principle we articulated in Pyramid Securities 
that on summary judgment a party is strictly held to her words in 
an affidavit does not necessarily mean that a party is bound by even 
a slip of the pen.

asm (or the lack thereof) on the interview summary sheet, 
weakening her claim that Aka's lack of enthusiasm motivated 
her decision.

 Furthermore, although employers may of course take sub-
jective considerations into account in their employment deci-
sions, courts traditionally treat explanations that rely heavily 
on subjective considerations with caution. Particularly in 
cases where a jury could reasonably find that the plaintiff was 
otherwise significantly better qualified than the successful 
applicant, an employer's asserted strong reliance on subjec-
tive feelings about the candidates may mask discrimination. 
Indeed, we observed in Fischbach v. D.C. Department of 
Corrections, 86 F.3d 1180, 1184 (D.C. Cir. 1996), that an 
employer's heavy use of "highly subjective" criteria, such as 
"interpersonal skills," could support an inference of discrimi-
nation. See generally Perfetti v. First Nat. Bank of Chicago, 
950 F.2d 449, 457 (7th Cir. 1991) (discussing "the ease with 
which employers may use subjective factors to camouflage 
discrimination") (citation omitted); Lilly v. Harris-Teeter 
Supermarket, 842 F.2d 1496, 1506 (4th Cir. 1988); Mark S. 
Brodin, The Demise of Circumstantial Proof in Employment 
Discrimination Litigation: St. Mary's Honor Center v. 
Hicks, Pretext, and the "Personality" Excuse, 18 Berk. J. 
Emp. Lab. L. 183, 218-24 (1997) (discussing the difficulties 
presented by the "personality" rationale for employment deci-
sions). Moreover, we cannot altogether ignore the fact that 
outward manifestations of "enthusiasm" are just the kind of 
traits that advancing age and heart-related disability may 
tend to diminish.19

 An employer's reliance on disputed subjective assessments 
will not create a jury issue in every employment discrimina-

__________
 19 The dissent complains that Aka has offered no evidence that he 
was more enthusiastic than Valenzuela at the interview. Dissenting 
opinion at 9. It would be difficult to offer any such evidence, in the 
absence of a videotape of the interview. Under the dissent's 
approach, an employer could defeat any employment discrimination 
claim by a job applicant by citing the interviewer's subjective 
assessment that he was less enthusiastic than some other candidate.


tion case. For example, if this reliance is modest, and the 
employer has other, well-founded reasons for the employment 
decision, summary judgment for the defendant may be appro-
priate. Here, however, a jury could find that Aka was in all 
other respects markedly better qualified for the job. A 
reasonable jury might still credit Breakenridge's claim that 
Aka "displayed no enthusiasm for or interest in the Pharmacy 
Technician job," and hence find that no discrimination oc-
curred. But a jury might also decide after assessing Break-
enridge's and Aka's credibility that Breakenridge's claim was 
untrue--indeed, a lie. This would, in turn, raise a strong 
inference of discriminatory intent, an inference that would not 
be undercut by any other facts in this case.

 This case thus turns on whose account of Breakenridge's 
interview with Aka is correct; that question will hinge on 
Aka's and Breakenridge's credibility, an issue that is quintes-
sentially one for the finder of fact. "Determining the weight 
and credibility of witness testimony ... has long been held to 
be the 'part of every case that belongs to the jury, who are 
presumed to be fitted for it by their natural intelligence and 
their practical knowledge of men and the ways of men.' " 
United States v. Scheffer, 118 S. Ct. 1261, 1266 (1998) (quot-
ing Aetna Life Ins. Co. v. Ward, 140 U.S. 76, 88 (1891)).

 b.Other evidence of discrimination

 As we have said, an employment discrimination plaintiff is 
not limited to arguing that the employer's explanation is 
wrong on the merits, but he can also attempt to show by 
other means that the explanation was made up to disguise 
illegitimate bias. There is some evidence from which an 
inference of that kind could be drawn in this case.

 A juror might conclude from the record that Breakenridge 
did not compare Aka's and Valenzuela's qualifications (in the 
way we do above) and decide that comparatively Valenzuela 
was the better candidate, but rather she decided not to hire 
Aka immediately after his interview, before she had even seen 
Valenzuela. On the interview summary sheet for Aka's inter-
view, she checked both the box for "not interested in this 
individual" and the box for "will consider with other appli-

cants." More tellingly, she wrote in her summary that Aka 
had "no skills which will be helpful as a pharmacy technician," 
and that his "MBPA degree could be best utilized in other 
areas of the hospital." It is hard to see how an interviewer 
could conclude that Aka had no skills that would be helpful as 
a pharmacy technician; for instance, his MBPA was certainly 
relevant to the accounting and billing work the job entailed. 
This notation suggests that for some reason Breakenridge 
came away from her interview with Aka with a strong aver-
sion to employing him, an aversion that colored her summary 
of Aka's qualifications.20 This aversion may have had some 
reasonable basis (such as Aka's asserted lack of enthusiasm), 
or it might have been rooted in bias (a perception that Aka 
was too old, or too disabled, to make a good employee).21

 Moreover, Breakenridge claimed in a later affidavit that 
Aka had told her during his job interview that he did not 
really want the pharmacy technician job. Aka denies having 
said this; there is thus a genuine issue of material fact on this 
point alone. If Aka did say this, it is strange that Breaken-
ridge did not note that fact on the interview summary sheet. 
An interviewer explaining why a candidate was not hired 
would ordinarily take note of the fact that he has virtually 
withdrawn his application. In a jury's eyes, this omission 

__________
 20 It is noteworthy that, while it took WHC two weeks to even 
grant Aka an interview, Valenzuela seems to have been hired the 
day after he applied. (There is no indication in the record that any 
other WHC employees applied for the job.) WHC received Valen-
zuela's application nine days after Aka was interviewed, on May 26. 
On May 27, WHC's personnel department made a notation on Aka's 
application that he had not been selected for the Pharmacy Techni-
cian position. The handwritten dates May 27 and May 28 also 
appear (without explanation) in the portion of Valenzuela's applica-
tion form reserved for notes by recruitment staff, suggesting that 
this is when he was hired.

 21 The interview summary sheet reveals that Breakenridge was 
aware of Aka's age and disability. In the opening sentence, she 
describes him as a "longstanding" WHC employee "on MLOA," or 
medical leave of absence.


might also count as evidence that Breakenridge's account of 
the interview was invented after the fact.

 In summary, we think that there is sufficient evidence in 
the record so that a reasonable jury could conclude that Aka 
was markedly more qualified than Valenzuela was, thus 
throwing into doubt the reason given for his rejection. Aka, 
after all, was a 19-year employee with a good record who had 
earned two degrees while on the job--yet after his bypass 
surgery he lost out to an applicant who had worked at the 
hospital for less than a year as a laundry-folder. Indeed, not 
only did Aka lose out for the Pharmacy Technician position, 
he was unable to secure any position at the several-thousand-
employee hospital, and after a while could not even get an 
interview for positions for which he applied. There is in sum 
enough evidence, we believe, to create a jury question as to 
whether WHC's explanation for not hiring Aka was false, and 
as to whether WHC acted with discriminatory intent, and 
summary judgment should not have been granted.

B.Reasonable Accommodation

 We now turn to Aka's claim that WHC should have accom-
modated his disability by reassigning him to a vacant position.

 The ADA prohibits discrimination on the basis of disability, 
and defines such discrimination to include

 not making reasonable accommodations to the known 
 physical or mental limitations of an otherwise qualified 
 individual with a disability who is an applicant or employ-
 ee, unless such covered entity can demonstrate that the 
 accommodation would impose an undue hardship on the 
 operation of the business of such covered entity.

42 U.S.C. s 12112(b)(5)(A). Under the ADA's scheme, then, 
it is discriminatory for a covered employer to decline to take 
reasonable steps to accommodate an employee's disability, 
unless the steps in question "would impose an undue hardship 
on the operation of the business" of the employer. The ADA 
also provides a definition of the term "reasonable accommoda-
tion":

 The term "reasonable accommodation" may include--

 (A) making existing facilities used by employees readi-
 ly accessible to and usable by individuals with disabilities; 
 and

 (B) job restructuring, part-time or modified work 
 schedules, reassignment to a vacant position, acquisition 
 or modification of equipment or devices, appropriate 
 adjustment or modifications of examinations, training 
 materials or policies, the provision of qualified readers or 
 interpreters, and other similar accommodations for indi-
 viduals with disabilities.

42 U.S.C. s 12111(9) (emphasis added). Citing this provision, 
Aka argues that WHC's failure to reassign him to a vacant 
position violated the ADA.

 Aka moved for summary judgment on his reasonable ac-
commodation claim before the district court; the district 
court denied this motion, and instead granted summary judg-
ment to WHC. The district court concluded that WHC could 
not have reassigned Aka without violating other employees' 
rights under the collective bargaining agreement governing 
Aka's workplace. The district court found that the ADA can 
never require an employer to violate such collectively bar-
gained rights, and that therefore Aka had no right to reas-
signment.

 1.Was Aka "otherwise qualified"?

 Before addressing the question of the effect of the collec-
tive bargaining agreement on this case, we consider a prelimi-
nary question raised by WHC. We will assume for purposes 
of this appeal that Aka's inability to do heavy lifting after his 
heart surgery meant that he could not perform the orderly 
job, with or without a reasonable accommodation.22 WHC 
argues that only a "qualified individual with a disability" can 
request a reasonable accommodation under 42 U.S.C. 
s 12112(b)(5)(A); the term "qualified individual with a disabil-

__________
 22 Aka conceded that he could not do his former orderly job. 
WHC assumes that this meant that Aka could not do the job even 
with a reasonable accommodation, see WHC's Brief at 25-28, and 
Aka does not challenge WHC's assumption on this appeal.

ity" is defined as someone who "with or without reasonable 
accommodation, can perform the essential functions of the 
employment position that such individual holds or desires." 
42 U.S.C. s 12111(8). WHC contends that, because Aka 
could not perform the essential functions of his job as an 
orderly with or without a reasonable accommodation, he was 
not an "otherwise qualified individual with a disability," and 
thus was not entitled to a reasonable accommodation at all 
under s 12112(b)(5)(A).

 WHC's argument misreads the statute. Section 12111(8) 
defines an "otherwise qualified individual with a disability" to 
mean someone who "with or without reasonable accommoda-
tion, can perform the essential functions of the employment 
position that such individual holds or desires." 42 U.S.C. 
s 12111(8) (emphasis added). An employee seeking reassign-
ment to a vacant position is thus within the definition if, with 
or without reasonable accommodation, she can perform the 
essential functions of the employment position to which she 
seeks reassignment. See Daugherty v. City of El Paso, 56 
F.3d 695, 698-99 (5th Cir. 1995).

 The Equal Employment Opportunity Commission's 
("EEOC's") interpretive guidelines and the ADA's legislative 
history both support this reading. The EEOC's interpretive 
guidelines provide that "reassignment should be considered 
only when accommodation within the individual's current 
position would pose an undue hardship." 29 C.F.R. app. 
s 1630.2(o). If WHC's reading of the ADA is correct, this 
guideline makes no sense. Under WHC's reading, an em-
ployee cannot obtain reassignment if he is not "otherwise 
qualified" for his current position. But under the EEOC's 
guidelines, only employees who cannot be accommodated in 
their current job without undue hardship--that is, only em-
ployees who are not "otherwise qualified" for their current 
position--should be reassigned. In other words, employees 
should only be reassigned if they have no entitlement to 
reassignment. This is a paradox worthy of Lewis Carroll, 
whose White Queen gave her maid "jam tomorrow and jam 
yesterday--but never jam today." Lewis Carroll, The Anno-
tated Alice 247 (New American Library 1960) (emphasis in 


original). Although the EEOC's guidelines are "not control-
ling upon the courts by reason of their authority," they "do 
constitute a body of experience and informed judgment to 
which courts and litigants may properly resort for guidance," 
Meritor Sav. Bank v. Vinson, 477 U.S. 57, 65 (1986), and we 
are understandably reluctant to adopt a reading of the ADA 
that is so at odds with those guidelines.

 Notably, the ADA's legislative history supports the 
EEOC's reading. In discussing reassignment, the House 
Report says:

 Reasonable accommodation may also include reassign-
 ment to a vacant position. If an employee, because of 
 disability, can no longer perform the essential functions 
 of the job that she or he has held, a transfer to another 
 vacant job for which the person is qualified may prevent 
 the employee from being out of work and [the] employer 
 from losing a valuable worker. Efforts should be made, 
 however, to accommodate an employee in the position 
 that he or she was hired to fill before reassignment is 
 considered.

H.R. Rep. No. 485(II), 101st Cong., 2d Sess. at 63 (1990), 
reprinted in 1990 U.S.C.C.A.N. 267, 345; see also S. Rep. No. 
116, 101st Cong., 1st Sess. at 6 (1989). In other words, 
Congress saw reassignment, as the EEOC does, as an option 
to be considered only after other efforts at accommodation 
have failed. See also Gile v. United Airlines, Inc., 95 F.3d 
492, 496-98 (7th Cir. 1996) (reading the EEOC's guidance and 
the statute's legislative history similarly). The one decision 
of a court of appeals to adopt WHC's argument has since 
been set for rehearing in banc; in any event, we find the 
reasoning of the panel opinion unpersuasive. See Smith v. 
Midland Brake, Inc., 138 F.3d 1304, 1308-10 (10th Cir. 1998), 
rehearing in banc granted, No. 96-3018, slip op. at 1 (10th 
Cir. May 5, 1998).

 2.The collective bargaining agreement

 The district court found that the collective bargaining 
agreement governing Aka's workplace precluded WHC from 
reassigning him to a vacant position, and hence Aka could not 

claim a right to the accommodation of reassignment. As we 
explain, on the present record we find it impossible to deter-
mine whether there is any conflict between the CBA and the 
ADA, and thus do not reach the question of what would occur 
on the particular facts of this case in the event of such a 
conflict.

 The district court found that the CBA's provisions govern-
ing posting and filling of job vacancies barred WHC from 
reassigning Aka. The CBA's posting provisions require 
WHC to give notice of any openings in designated locations 
for at least five working days before they may be filled. CBA 
s 14.19. As to filling of vacancies, the CBA provides:

 It is expressly understood that employees with the ability 
 to perform the work and who possess an acceptable work 
 record will be given preferential treatment over non-
 Hospital employees in filling bargaining unit vacancies. 
 If more than one employee bids for a particular job, and 
 if in the Hospital's judgment competing employees have 
 equal ability to perform the work and possess equally 
 acceptable work records, the employee with greater se-
 niority shall be awarded the job. It shall be the obli-
 gation of the employee first to make application for the 
 position involved. In any case where there is a dispute 
 as to whether an applicant possesses requisite "ability," 
 the burden of proof shall be with the employee and/or 
 the Union.... 

CBA s 8.1(b). Finally, the CBA has a provision entitled 
"Handicapped Employees," which states:

 An employee who becomes handicapped and thereby 
 unable to perform his job shall be reassigned to another 
 job he is able to perform whenever, in the sole discretion 
 of the Hospital, such reassignment is feasible and will not 
 interfere with patient care or the orderly operation of the 
 Hospital.

CBA s 14.5.

 Aka and the EEOC argue that section 14.5 permitted WHC 
to reassign Aka to a vacant position without complying with 

the CBA's provisions on seniority and posting vacancies. 
WHC disagrees, arguing vigorously that section 14.5 is not 
intended to function as an exception to those provisions, and 
that an employee can only be reassigned under section 14.5 
after the CBA's posting and seniority rules have been com-
plied with.23

 WHC's reading of section 14.5 is at odds with that provi-
sion's plain meaning. To assign, according to Webster's Third 
New International Dictionary, means "to appoint (one) to a 
post or duty." An employee who is allowed to compete for 
jobs precisely like any other applicant has not been "reas-
signed"; he may have changed jobs, but he has done so 
entirely under his own power, rather than having been ap-
pointed to a new position. Moreover, WHC's reading would 
render section 14.5 meaningless. As WHC interprets that 
section, it would give neither WHC nor its employees any 
rights or powers that they do not already enjoy under other 
sections of the collective-bargaining agreement.24 We assume 

__________
 23 Arguably, the only tension that exists is between section 14.5 
and the CBA's seniority rules, not its posting rules. If it chose, 
WHC could (for example) comply with the posting requirement by 
posting notice of several vacancies, and then, once applications were 
in, reassign a disabled employee to the vacant position that WHC 
considered most appropriate, in light of the applicant pool and the 
disabled employee's capabilities.

 24 WHC argues that its reading does not completely eviscerate 
section 14.5, because that section allows it to grant extended job-
search leaves of the kind awarded to Aka. Not only is there no 
textual basis for this reading of section 14.5, but WHC already has 
authority to extend leave under the CBA. Section 7.4, which sets 
time limits on leaves of absence, permits WHC to waive those limits 
upon a written request.

 WHC also claims that this situation is governed, not by section 
14.5 of the CBA, but by section 7.3, which allows hospital employees 
returning from leaves of absence to retain their seniority and their 
preference over non-hospital employees. This misunderstands the 
functions of the two provisions. Section 7.3 governs employees 
returning from any type of extended leave of absence; such leaves 
may be granted for reasons ranging from "emergency conditions, 

that the parties intended for every part of the agreement to 
have meaning; interpretations that would render a portion of 
the agreement ineffective or mere surplusage are traditional-
ly disfavored by courts. See Farnsworth On Contracts 
s 7.11 (1990); see also Conoco, Inc. v. NLRB, 91 F.3d 1523, 
1526 (D.C. Cir. 1996).

 Finally, collective bargaining agreements are interpreted 
wherever possible so as to be consistent with federal labor 
law. See International Union of Automobile, Aerospace and 
Agricultural Implement Workers v. Yard-Man, Inc., 716 
F.2d 1476, 1480 (6th Cir. 1983). Thus, an interpretation of 
section 14.5 which allows WHC to implement its ADA obli-
gations is distinctly preferred. Indeed, Congress expressly 
suggested that, as a way of avoiding conflicts between the 
CBA and the ADA, collective bargaining agreements incorpo-
rate provisions "permitting the employer to take all actions 
necessary to comply with this legislation." H.R. Rep. No. 
485(II), 101st Cong., 2d Sess. at 63 (1990), reprinted in 1990 
U.S.C.C.A.N. 267, 346.

 It seems clear that WHC had power, under section 14.5 of 
the CBA, to reassign its disabled employees to vacant posi-
tions in at least some circumstances. On the present record, 
we cannot (and need not) reach the further question of 
whether in every case in which the ADA would require WHC 
to reassign an employee, section 14.5 would permit WHC to 
do so. The ADA's reassignment standard and that of section 
14.5 are worded differently. The ADA requires covered 
entities to reasonably accommodate disabled employees un-
less they can demonstrate that such reassignment "would 
impose an undue hardship on the operation of the business of 
such covered entity." 42 U.S.C. s 12112(b)(5)(A). Section 
14.5, by contrast, permits reassignment only if the hospital 

__________
unusual home situations, education, travel or other serious cause." 
CBA s 7.17. Section 14.5, by contrast, is directed solely at disabled 
employees. Indeed, Aka could have become disabled, and thus have 
been within section 14.5, without ever taking a leave of absence, and 
so coming within section 7.3.


determines, in its "sole discretion," that "reassignment is 
feasible and will not interfere with patient care or the orderly 
operation of the Hospital." The language of section 14.5 
seemingly grants quite broad reassignment powers to WHC. 
But it may be that those powers are not as broad as they 
seem. The union that negotiated the CBA has not participat-
ed in the proceedings before this court or before the district 
court, and extrinsic evidence--as to, for instance, section 
14.5's negotiating history--might show that there are in fact 
limits to WHC's discretion to reassign employees under that 
section.25 We will leave to the district court the determina-
tion of how broad WHC's reassignment powers under section 
14.5 are, and whether reassigning Aka would have been 
permissible under that provision, properly interpreted.

 3.The dissents26

 The dissenters appear to argue that Aka's ADA claim can 
be rejected out of hand without reference to the CBA, 
because (1) the only discrimination he alleged was his failure 
to obtain the pharmacy position, and (2) his only right was to 
be treated like any other applicant for that position, which the 
dissent believes he indisputably was. Although under our 
normal procedures we would not consider either argument 

__________
 25 We assume that if the ADA requires WHC to reassign Aka, 
and WHC has the power to make the reassignment without violat-
ing the CBA rights of its other employees, WHC must make the 
reassignment, and may not refuse to do so on the grounds that it 
subjectively judges the CBA's standard not to be satisfied. This is 
so because if the rights of WHC's other employees under the CBA 
would not be violated by a reassignment, then the only CBA rights 
WHC has to invoke are its own. WHC would thus effectively be 
claiming that the CBA waives Aka's ADA rights. Although we 
need not decide now whether such waivers are permissible, we are 
skeptical. See Alexander v. Garder-Denver Co., 415 U.S. 36, 51 
(1974) (Title VII rights may not be waived in a CBA); cf. Kralik v. 
Durbin, 130 F.3d 76, 81 (3d Cir. 1997) (observing that if a union 
declined to object to the accommodation of a disabled employee, this 
would eliminate any risk of conflict between the CBA and the ADA, 
without adverting to the employer's possible CBA rights).

 26 Judge Sentelle does not join in Section B.3.

because they were not raised in the district court and were 
not within the scope of this court's grant of in banc review, in 
deference to our dissenting colleagues we will respond briefly.

 We believe that Aka asserted below that he should have 
been reassigned to some existing vacancy for which he was 
qualified. This was how the district court interpreted his 
claim and how the panel originally construed it. Thus, Aka 
was not complaining only of his rejection for the pharmacy 
position; rather, his claim was that, because his disability 
rendered him unable to continue work at WHC unless he was 
reassigned to a new position, WHC's failure to reassign him 
in violation of its ADA obligations amounted either to con-
structively discharging him or to discriminating in filling 
those vacancies to which he should have been reassigned, 
both violations of section 12112(a).27

 Turning to the second part of the dissenters' argument, 
they claim that a disabled employee is never entitled to any 
more consideration for a vacant position than an ordinary 
applicant, because according to the disabled employee any 
kind of help would be a prohibited preference. We believe 
the dissents misunderstand both the text and legislative 
history of the statute, and deviate from the construction of 
the statute by other circuits. To begin with the statutory 
text, the word "reassign" must mean more than allowing an 

__________
 27 Under the applicable caselaw, it is true that Aka had an 
obligation to demonstrate that there existed some vacant position to 
which he could have been reassigned. See, e.g., McCreary v. 
Libbey-Owens-Ford Co., 132 F.3d 1159, 1165 (7th Cir. 1997). On the 
other hand, WHC had a corresponding obligation to help him 
identify appropriate job vacancies (since plaintiffs can hardly be 
expected to hire detectives to look for vacancies). See, e.g., Dalton 
v. Subaru-Isuzu Automotive, Inc., 141 F.3d 667, 677 (7th Cir. 1998) 
("[T]he ADA places a duty on the employer to 'ascertain whether he 
has some job that the employee might be able to fill.' ") (quoting 
Miller v. Illinois Dep't. of Corrections, 107 F.3d 483, 487 (7th Cir. 
1997)); Mengine v. Runyon, 114 F.3d 415, 419-20 (3d Cir. 1997). 
Thus far in the case, the parties have addressed neither the issue of 
whether appropriate vacancies existed nor that of whether WHC 
adequately discharged its duty to help Aka find them.

employee to apply for a job on the same basis as anyone else. 
An employee who on his own initiative applies for and obtains 
a job elsewhere in the enterprise would not be described as 
having been "reassigned"; the core word "assign" implies 
some active effort on the part of the employer.28 Indeed the 
ADA's reference to reassignment would be redundant if 
permission to apply were all it meant; the ADA already 
prohibits discrimination "against a qualified individual with a 
disability because of the disability of such individual in regard 
to job application procedures." 42 U.S.C. s 12112(a); see 
Ratzlaf v. United States, 510 U.S. 135, 140 (1994) (saying that 
"[j]udges should hesitate" to read statutory provisions as 
"surplusage").

 Although the ADA's legislative history does warn against 
"preferences" for disabled applicants, see H.R. Rep. No. 
485(II), 101st Cong., 2d Sess., at 56 (1990), reprinted in 1990 
U.S.C.C.A.N. 267, 338, it also makes clear that reasonable 
accommodations for existing employees who become disabled 
on the job do not fall within that ban. See H.R. Rep. No. 
485(II), 101st Cong., 2d Sess. at 63 (1990), reprinted in 1990 
U.S.C.C.A.N. 267, 345 ("If an employee, because of disability, 
can no longer perform the essential functions of the job that 
she or he has held, a transfer to another vacant job for which 
the person is qualified may prevent the employee from being 
out of work and [the] employer from losing a valuable work-
er.") (emphasis added). Had Congress intended that disabled 
employees be treated exactly like other job applicants, there 
would have been no need for the report to go on to explain 
that " 'bumping' another employee out of a position to create 
a vacancy is not required," and that "if a collective bargaining 
agreement reserves certain jobs for employees with a given 
amount of seniority, it may be considered as a factor in 
determining whether it is a reasonable accommodation to 
assign an employee with a disability without seniority to the 
job," id.; there would have been no danger that an employee 

__________
 28 See supra s II.B.2 (similiarly interpreting the word "reassign" 
in a collective-bargaining agreement).


would be "bumped," or that a job would go to a disabled 
employee with less seniority.

 Numerous courts have assumed that the reassignment 
obligation means something more than treating a disabled 
employee like any other job applicant. See, e.g., Gile, 95 F.3d 
at 496-99 (describing what a plaintiff must show in order to 
demonstrate entitlement to reassignment, without mentioning 
a requirement that he show he would have been awarded the 
position over all other applicants); Mengine, 114 F.3d at 418 
(same); Benson v. Northwest Airlines, Inc., 62 F.3d 1108, 
1114-15 (8th Cir. 1995) (same). Furthermore, the courts that 
have said that the ADA does not permit "preferences" in 
awarding jobs to the disabled have generally said so in the 
course of rebuffing requests which would have been especially 
disruptive to the employer's ordinary operations. See, e.g., 
Dalton, 141 F.3d at 679 (concluding that requiring an employ-
er to make a reassignment in violation of a legitimate, nondis-
criminatory policy, such as a policy against demotions, would 
grant an improper preference, but without making a similar 
objection to the reassignment requirement itself); Daugherty 
v. City of El Paso, 56 F.3d 695, 699 (5th Cir. 1995) (plaintiff 
sought to escape the requirement, applied to all employees, 
that he take a written exam in order to move from a part-
time to a full-time job).29

__________
 29 The ADA's reasonable accommodation requirement treats dis-
abled and non-disabled employees differently in a number of other 
respects. Among the accommodations it lists are "job restructur-
ing," "part-time or modified work schedules," "training materials or 
policies," and "the provision of qualified readers or interpreters." 
42 U.S.C. s 12111(9)(B). Non-disabled employees may not request 
part-time or modified work schedules, or ask that they be provided 
with a reader, even though they may have excellent reasons to want 
these conveniences.

 Treating a disabled employee who is no longer able to perform 
his existing job somewhat differently from other applicants for the 
same position need not always be highly disruptive to an employer's 
operations or seriously infringe the interests of other employees. 
After all, seniority systems are not equated with undesirable prefer-
ence schemes, even though they may have a much more profound 

 Recognized constraints on an employer's obligation to reas-
sign a disabled employee further limit the disruption associat-
ed with reassignments. Most importantly, the ADA does not 
require that a disabled employee be reassigned to a position 
for which he is not otherwise qualified, see 42 U.S.C. 
s 12112(b)(5)(A), or if reassignment would be an undue hard-
ship on the operation of the business of the employer, see id. 
An employee need not be reassigned if no vacant position 
exists, see id. s 12111(9); likewise, employers are not re-
quired to "bump" an employee, or to create a new position. 
Terrell v. USAir, 132 F.3d 621, 626 (11th Cir. 1998). An 
employer is not required to reassign a disabled employee in 
circumstances "when such a transfer would violate a legiti-
mate, nondiscriminatory policy of the employer," Dalton, 141 
F.3d at 679 (also noting some limitations to this rule). Final-
ly, "[a]n employer is not required to provide an employee that 
accommodation he requests or prefers, the employer need 
only provide some reasonable accommodation." Gile, 95 F.3d 
at 499.

 Without briefing or any record on the issue we decline to 
decide the precise contours of an employer's reassignment 
obligations. To adopt the dissenters' interpretation of the 
reassignment provision as mandating nothing more than that 
the employer allow the disabled employee to submit his 
application along with all of the other candidates, however, 
would render that provision a nullity. That is all that we 
need say at this point.

 III. Conclusion

 As to Aka's disparate treatment claim based on the Phar-
macy Technician hiring decision, we conclude that he has 
made out a case sufficient to survive summary judgment 

__________
effect on the workplace. (For instance, unlike the ADA, seniority 
systems often provide that less senior employees are laid off first, 
and allow for "bumping.") And moving a disabled employee to a 
new position necessarily creates a job vacancy, which may well be 
more desirable to third parties than was the position to which the 
employee was reassigned.

under the appropriate reading of McDonnell Douglas and 
Hicks. We accordingly vacate the district court's grant of 
summary judgment to WHC on this issue.30 The question of 
whether WHC intentionally discriminated against Aka in the 
Pharmacy Technician hiring decision because of his age 
and/or his disability is one for a jury to decide.

 As to Aka's reasonable accommodation claim, we reject 
WHC's claim that Aka's inability to perform his orderly job 
even with a reasonable accommodation rendered him ineligi-
ble for the reasonable accommodation of reassignment. We 
also find that the district court was incorrect in perceiving a 
conflict under all circumstances between the terms of the 
CBA and the ADA, and so need not have reached the issue of 
what would occur in the event of such a conflict. We thus 
reverse the district court's grant of summary judgment to 
WHC on this issue. On remand, the district court should 
determine, through summary judgment or trial, whether on 
the facts of this case WHC had an obligation under the ADA 
to reassign Aka to a vacant position. This entails deciding, 
among other questions, whether a vacant position for which 
Aka was qualified was available, and whether reassigning Aka 
would have been an undue hardship. If WHC was obliged to 
reassign Aka, the district court should then decide whether 
section 14.5 of the CBA permitted WHC to perform this 
reassignment. Only if the district court concludes that WHC 
did not have the power to reassign Aka under section 14.5 but 
that the ADA required WHC to reassign him will the ADA 
and the CBA be in conflict. Given the large number of 
contingencies that could preclude such a conflict, we see no 
need to address whether, if such a conflict arose, the CBA or 
the ADA would give way in the circumstances of this case.

 So ordered.

__________
 30 Those portions of the panel judgment, vacated on the grant of 
rehearing in banc, which affirm the trial judge's summary judgment 
rulings in favor of WHC as to Aka's remaining claims, are hereby 
reinstated.

Karen LeCraft Henderson, Circuit Judge, with whom 
Silberman, Williams and Ginsburg, Circuit Judges, join, dis-
senting:

 What remains of this case is neither complex nor difficult. 
Etim U. Aka contends that the district court incorrectly 
granted summary judgment on his claims against his former 
employer, Washington Hospital Center (Washington Hospi-
tal), under the Age Discrimination in Employment Act of 
1967, 29 U.S.C. ss 621 et seq., (ADEA) and the Americans 
with Disabilities Act (ADA), 42 U.S.C. ss 12101 et seq. Aka 
has alleged that Washington Hospital (1) failed to hire him as 
a pharmacy technician on account of his age and disability in 
violation of both the ADEA and the ADA and (2) failed to 
reassign him to another position as a reasonable accommoda-
tion under the ADA when his disability prevented him from 
performing the duties of his former job as an orderly.1 Aka's 
first claim fails because he produced no evidence in the 
district court to prove, as he must under a long line of 
decisions culminating in St. Mary's Honor Center v. Hicks, 
509 U.S. 502 (1993), that Washington Hospital's nondiscrimi-
natory reasons for rejecting his application were proffered as 
a pretext for its true motive which was discriminatory. Aka's 
second claim fails because he has not tied the alleged failure 

__________
 1 In his all-inclusive complaint, Aka also alleged other claims of 
discrimination. The panel affirmed (and rehearing was not grant-
ed) on Aka's ADA and ADEA claims based on his failure to secure 
file clerk positions with Washington Hospital and Aka himself 
eventually dropped his claims of violation of the District of Colum-
bia Family and Medical Leave Act, see Aka v. Washington Hospi-
tal, 116 F.3d 876, 879 n.2 (D.C. Cir. 1997), and discrimination on the 
basis of race and national origin, see Brief of Appellant Etim U. Aka 
on Rehearing in Banc at 5 n.2; see also Aka v. Washington 
Hospital 116 F.3d at 902 n.6 (Henderson, J., dissenting in part) 
("The record manifests Aka's successful twenty-year employment 
relationship with Washington Hospital. To note the obvious, his race 
and national origin did not change during that time. To infer that 
Washington Hospital would begin discriminating on the basis of his 
race and national origin after twenty years of non-discrimination 
strains credulity.").


to accommodate to a specific actionable employment decision, 
as explained in our holding in Marshall v. Federal Express 
Corp., 130 F.3d 1095 (D.C. Cir. 1997).

 I.

 First, the district court correctly granted summary judg-
ment on Aka's discrimination claims under the ADEA and the 
ADA because Aka produced no evidence raising a triable 
issue of fact about either whether Washington Hospital's 
articulated reasons for rejecting Aka's application were false 
and or whether its real reason was discriminatory.

 In both ADEA and ADA discrimination cases we apply the 
burden allocation scheme first announced in McDonnell 
Douglas Corp. v. Green, 411 U.S. 792 (1973). See Paquin v. 
Federal Nat'l Mortgage Ass'n, 119 F.3d 23, 26 (D.C. Cir. 
1997) (ADEA case); Marshall v. Federal Express Corp., 130 
F.3d 1095, 1099 (D.C. Cir. 1997) (ADA case).2 As we have 
previously explained:

 Under the first step of McDonnell Douglas the complain-
 ant must establish a prima facie case of discrimina-
 tion.... If the complainant succeeds in establishing a 
 prima facie case, the second step of the McDonnell 
 Douglas framework shifts the burden to the defendant 
 employer to articulate a legitimate, nondiscriminatory 
 reason for its adverse employment action. If the defen-
 dant does so, then under the third step of McDonnell 
 Douglas the complainant must produce evidence showing 
 that the defendant's proffered reason is but a pretext for 
 discrimination.

Paquin, 119 F.3d at 26-27 (internal citations omitted). Key 
to the third step of the analysis is the phrase "pretext for 

__________
 2 In O'Connor v. Consolidated Coin Caterers Corp., 517 U.S. 308, 
311 (1996), the Supreme Court "assumed," without actually decid-
ing, that the McDonnell Douglas framework applied in ADEA 
cases. The Court has yet to address whether the framework 
applies to ADA cases.

discrimination," which has sometimes been construed (incor-
rectly) to mean simply a false reason.

 The word "pretext" is defined as "[t]hat which is put 
forward to cover the real purpose or object." See XII Oxford 
English Dictionary 437 (2d ed. 1989). Thus, a pretext is not 
merely a false reason but a false reason proffered to cover up 
the true reason. See Fisher v. Vassar College, 114 F.3d 1332, 
1337-38 (2d Cir. 1997) (en banc) ("[D]iscrimination does not 
lurk behind every inaccurate statement.... In short, the 
fact that the proffered reason was false does not necessarily 
mean that the true motive was the illegal one argued by the 
plaintiff."), cert. denied, 118 S. Ct. 851 (1998). Recognizing 
this, the Hicks majority repeatedly explained that a plaintiff 
must do more than simply cast doubt on the truth of the 
employer's proffered legitimate reason; he must also affirma-
tively show it was proffered as a cover-up for a discriminato-
ry reason.3 See 509 U.S. at 507-08 (" 'If the defendant 
carries this burden of production, the presumption raised by 
the prima facie case is rebutted' and 'drops from the case.' 
The plaintiff then has 'the full and fair opportunity to demon-
strate,' through presentation of his own case and through 
cross-examination of the defendant's witnesses, 'that the prof-
fered reason was not the true reason for the employment 
decision,' and that race was. He retains that 'ultimate bur-
den of persuading the [trier of fact] that [he] has been the 
victim of intentional discrimination.' ") (quoting Texas Dept. of 
Community Affairs v. Burdine, 450 U.S. 248, 255, 255 n.10, 
256 (1981)) (emphasis added); id. at 514-15 ("[N]othing in law 
would permit us to substitute for the required finding that the 
employer's action was the product of unlawful discrimination, 
the much different (and much lesser) finding that the employ-
er's explanation of its action was not believable."); 509 U.S. at 
515 ("A reason cannot be proved to be 'a pretext for discrimi-

__________
 3 There are many explanations for an employer's reluctance to 
disclose a true, nondiscrimnatory reason for an adverse employ-
ment decision. For example, the real motive might be embarrass-
ing, albeit lawful, or the employer might simply wish to spare the 
feelings of an employee he considered unsatisfactory in perfor-
mance, personality or some other regard.


nation' unless it is shown both that the reason was false, and 
that discrimination was the real reason."). This is how four 
other circuits--and even the Hicks dissent--have interpreted 
the plain language in the Hicks majority opinion. See 
Vaughan v. Metrahealth Cos., 145 F.3d 197 (4th Cir. 1998); 
Ryther v. Kare 11, 108 F.3d 832, 836-37 (8th Cir.) (en banc), 
cert. denied, 117 S.Ct. 2510 (1997); Hidalgo v. Conado Ins. 
Agencies, Inc., 120 F.3d 328, 335-37 (1st Cir. 1997); Fisher v. 
Vassar College, 114 F.3d 1332, 1337-38 (2d Cir. 1997) (en 
banc); Rhodes v. Guiberson Oil Tools, 75 F.3d 989, 994 (5th 
Cir. 1996) (en banc); 509 U.S. at 535 (Souter, J., dissenting). 
I would do likewise.

 It is true that the majority opinion in Hicks also included 
the following language, routinely cited by courts that require 
a plaintiff to show only that the proffered reason is false:4

 The factfinder's disbelief of the reasons put forward by 
 the defendant (particularly if disbelief is accompanied by 
 a suspicion of mendacity) may, together with the ele-
 ments of the prima facie case, suffice to show intentional 
 discrimination. Thus, rejection of the defendant's prof-
 fered reasons will permit the trier of fact to infer the 
 ultimate fact of intentional discrimination, and the Court 
 of Appeals was correct when it noted that, upon such 
 rejection, "[n]o additional proof of discrimination is re-
 quired."

509 U.S. at 511 (first emphasis added; footnote omitted) 
(quoting Hicks v. St. Mary's Honor Center, 970 F.2d 487, 493 
(8th Cir. 1992)). The quoted passage does not mean, as some 
courts have construed it, that disbelief coupled with proof of a 
prima facie case is always sufficient either to survive sum-

__________
 4 See, e.g., Combs v. Plantation Patterns, 106 F.3d 1519, 1529 
(11th Cir. 1997), cert. denied, 118 S.Ct. 685 (1998); Kline v. Tennes-
see Valley Auth., 128 F.3d 337, 343-44 (6th Cir. 1997) (en banc); 
Sheridan v. E.I. DuPont de Nemours & Co., 100 F.3d 1061, 1066-67 
(3d Cir. 1996) (en banc), cert. denied, 117 S.Ct. 2532 (1997); 
Anderson v. Baxter Healthcare Corp., 13 F.3d 1120, 1123-24 (7th 
Cir. 1994); Washington v. Garrett, 10 F.3d 1421, 1433 (9th Cir. 
1993) (as amended).

mary judgment or to support a jury verdict. "The word 
'may' is ambiguous. It might mean that the factfinder is 
completely free to find discrimination, in the sense that an 
appellate court could never reverse such a decision on the 
evidence. Alternatively, it might mean that in some cases the 
combination will be adequate to sustain a finding of discrimi-
nation, in others not, to be determined by the factfinder 
initially, and the appellate court on review, according to the 
usual principles." Barbour v. Merrill, 48 F.3d 1270, 1281 
(D.C. Cir. 1995) (Williams, J., concurring in denial of rehear-
ing). Given the Hicks majority's repeated emphasis on the 
need to prove that an employer's proffered reason for an 
employment action is a pretext for discrimination, I can only 
conclude, as did Judge Williams, that the Court intended 
"may" to bear the second meaning. As the Fourth Circuit 
explained:

 Undoubtedly, the quoted passage suggests that some 
 plaintiffs may reach the jury solely on the basis of "[t]he 
 factfinder's disbelief of the reasons put forward by the 
 defendant ... together with the elements of the prima 
 facie case." This is unremarkable, as a prima facie case 
 of age discrimination often requires "some other evidence 
 that the employer did not treat age neutrally," such as 
 discriminatory comments or marked favoritism towards 
 younger, less qualified workers. Depending on the char-
 acter of the evidence in each case, a discrimination claim 
 may survive summary judgment solely on the strength of 
 the prima facie case and the evidence that contradicts the 
 employer's proffered justification--if that evidence pro-
 vides a factual basis for the ultimate finding of discrimi-
 nation.

Vaughan v. Metrahealth Cos., 145 F.3d at 201 (quoting Equal 
Employment Opportunity Comm'n v. Western Electric Co., 
713 F.2d 1011, 1015 (4th Cir. 1983)); see also Isenbergh v. 
Knight-Ridder Newspaper Sales, Inc., 97 F.3d 436, 441 (11th 
Cir. 1996) (per curiam) ("The first sentence of [the quoted 
Hicks] passage shows that disbelief of the employer's prof-
fered reason may (and by implication, may not) be enough for 
a plaintiff to overcome an employer's motion for judgment as 


a matter of law. The second sentence is potentially more 
confusing in saying that rejection of the proffered reason 'will 
permit' the inference of discrimination. But keeping in mind 
that the word 'will' sometimes means 'can' (for example, 'can 
permit') or 'capable of,' (for example, 'capable of permitting'), 
both sentences, when read together, at least strongly suggest 
that rejecting the employer's proffered reason is not always 
sufficient to allow a finding of discrimination, although some-
times '(particularly if disbelief is accompanied by a suspicion 
of mendacity)' it might be."), cert. denied, 117 S.Ct. 2511 
(1997); Rhodes v. Guiberson Oil Tools, 75 F.3d 989, 994 (5th 
Cir. 1996) (en banc) ("The evidence necessary to support an 
inference of discrimination will vary from case to case. A 
jury may be able to infer discriminatory intent in an appro-
priate case from substantial evidence that the employer's 
proffered reasons are false. The evidence may, for example, 
strongly indicate that the employer has introduced fabricated 
justifications for an employee's discharge, and not otherwise 
suggest a credible nondiscriminatory explanation."); Kelley v. 
Airborne Freight Corp., 140 F.3d 335, 348 (1st Cir. 1998) 
("Thus, under the ADEA, if the plaintiff establishes that the 
defendant's proffered reasons for the adverse employment 
action are not the true reasons, the trier of fact may, depend-
ing on the overall evidence, but is not required, to infer that 
intentional age-based discrimination was a determinative fac-
tor in the adverse employment action.") (emphasis added).

 In a welcome concession to common sense, the majority 
seems to agree that the plaintiff, to survive summary judg-
ment, must do something more than simply show that the 
proffered reason could be false. See, e.g., Maj. Op. at 9-10. 
The problem is that in its very next breath the majority 
rejects "any reading of Hicks under which employment dis-
crimination plaintiffs would be routinely required to submit 
evidence over and above rebutting the employer's stated 
explanation in order to avoid summary judgment." Id. In 
other words, once the defendant has offered a non-
discriminatory rationale and the plaintiff has raised a jury 
question as to its veracity, the majority would place some sort 
of additional burden on the defendant--to show, perhaps that 
the plaintiff's own evidence points to a permissible (although 


perhaps embarrassing) "third" motive, see Maj. Op. at 11 or 
that the defendant has a sterling record on equal employment 
opportunity matters in general, see id. at 12. If the defen-
dant does not carry this burden, then the jury will be allowed 
to infer the ultimate fact of discrimination from the existence 
of some rebuttal evidence--evidence which, by its very he-
said-she-said nature, tends to be easy to come by. To make 
matters worse, the majority refuses "to say in any concise or 
generic way when such an inference will be appropriate." Id. 
at 17. The result is a framework (if one can call it that) that 
is both devoid of intelligible standards and incompatible with 
the principle that the plaintiff bears the burden of proof on 
the ultimate fact. See Hicks, 509 U.S. at 511 ("[T]he Court of 
Appeals' holding that rejection of the defendant's proffered 
reasons compels judgment for the plaintiff disregards the 
fundamental principle of Rule 301 that a presumption does 
not shift the burden of proof, and ignores our repeated 
admonition that the Title VII plaintiff at all times bears the 
'ultimate burden of persuasion.' ").

 In light of the plain meaning of Hicks, I conclude that an 
employment discrimination plaintiff must offer evidence not 
only that the employer proffered an untrue reason for the 
challenged employment action but also--whether as part of 
the prima facie case or independently--that the employer did 
so in order to cover up the true reason--which reason was 
discriminatory. Aka has failed to point to any such showing 
in the record, which contains no evidence raising a triable 
issue of fact as to whether Washington Hospital's proffered 
reasons for rejecting his application for the pharmacy techni-
cian opening were false, much less whether they were pre-
texts for discrimination.

 In the district court Washington Hospital offered two non-
discriminatory reasons for hiring Jaime Valenzuela over Aka: 
(1) Valenzuela had more relevant experience for the pharma-
cy technician position and (2) Valenzuela displayed more 
enthusiasm during his interview than Aka did in his. Aka has 
failed to identify evidence discrediting either reason.


 To counter Washington Hospital's assertion that Valenzuela 
was more qualified, Aka argues that both his education 
(Bachelor's and Master's degrees in Public Health Service 
Management) and his experience (twenty years as an orderly 
at Washington Hospital) made him more qualified that Valen-
zuela who had "extremely little relevant experience, and no 
relevant education." Appellant's Brief at 27. That Aka had 
more education and more hospital experience is undisputed. 
But neither was particularly "relevant."

 The published "qualifications" for a pharmacy technician 
list no educational requirement--not even a high school diplo-
ma.5 Nor is there any evidence that its duties require--or 
would benefit from--either a Bachelor's or a Master's degree. 
Ann Breakenridge, who interviewed both applicants for the 
pharmacy technician opening, recognized that Aka's education 
degrees would be wasted in the pharmacy technician job, 
noting in her "interview summary report" that "Mr. Aka's 
MBPA degree could be best utilized in other areas of the 
Hospital." JA 230. Put simply, Aka's academic credentials 
did nothing to enhance his qualifications for the position for 
which he applied.6

 Nor did Aka's experience--at least insofar as it was known 
to Dr. Breakenridge at the time she chose Valenzuela over 
him--make him a better candidate for the technician opening. 
Aka asserted in an affidavit below (and we must accept as 
true here) that as an orderly he "was regularly assigned to 
pick up medications from Pharmacy, stock medications in the 
nurses work area, and even sometimes prepare orders for 

__________
 5 The qualifications for the position of orderly--which Aka for-
merly occupied--required a "[h]igh school diploma or equivalent." 
JA 324.

 6 In fact, in contrast to the majority's observation, see Maj. Op. at 
24 n.15, some courts have concluded that claimed reliance on 
criteria not mentioned in a job description supports an inference of 
discrimination. Courtney v. Biosound, Inc., 42 F.3d 414, 421 (7th 
Cir. 1994); Gallo v. Prudential Residential Servs., 22 F.3d 1219, 
1225 (2d Cir. 1994); Gaworski v. ITT Commercial Fin. Corp., 17 
F.3d 1104, 1109 (8th Cir.), cert. denied, 513 U.S. 946 (1994).

medications that were not in sufficient stock in the nurses 
work area," that he "had extensive knowledge and back-
ground with the forms used by the pharmacy for filling 
medications" and that he "knew how most of the medications 
were used by nurses in their care of patients." JA 391. Yet 
there is no record evidence that Aka ever brought this 
"relevant experience" to the attention of Breakenridge or that 
Breakenridge was aware of it7--as she was of Valenzuela's 
two months of actual pharmacy employment and his experi-
ence in "pricing, stocking, [and] filling up cassettes," noted on 
his application. JA 226.

 Aka also disputes Breakenridge's assessment that he was a 
less enthusiastic applicant than Valenzuela, maintaining that 
he too displayed enthusiasm for the position during his inter-
view. But Breakenridge's judgment about the two applicants' 
enthusiasm was an inherently comparative one. See JA 222-
23. Assuming that Aka was enthusiastic, he offers no evi-
dence to show that Valenzuela was not more so (or at least 
that Valenzuela did not appear that way during his interview). 
More to the point, Aka cited no evidence that Washington 
Hospital offered either lawful justification as a pretext to 
conceal an unlawful motive. If Aka's claim, devoid as it is of 
any discriminatory showing, can survive summary judgment, 
I cannot envision a claim that would not.

 II.

 I would also affirm the district court's summary judgment 
on Aka's ADA reasonable accommodation claim. Aka alleges, 
as far as I can tell, that Washington Hospital breached its 
duty under the ADA to transfer Aka, as a reasonable accom-

__________
 7 In her interview summary report Breakenridge noted only that 
Aka's orderly position had a "drug delivery aspect," JA 229, which 
is consistent with both the published description of the orderly 
position (orderly "[c]ollects and/or delivers a variety or items to and 
from the unit," including "Medical Materials," JA 323) and Aka's 
own deposition testimony (that his "experience in pharmacy services 
consists of transporting narcotics and drugs to and from the phar-
macy" and that he had "[n]o other experience," JA 129).


modation, to a job that he could perform notwithstanding his 
disability. I do not question that under certain circumstances 
an employer has a duty to reasonably accommodate an em-
ployee's disability by reassigning him to an open position for 
which he is qualified. See 42 U.S.C. s 12112(a) ("No covered 
entity shall discriminate against a qualified individual with a 
disability because of the disability of such individual in regard 
to job application procedures, the hiring, advancement, or 
discharge of employees, employee compensation, job training, 
and other terms, conditions, and privileges of employment."); 
42 U.S.C. s 12112(b)(5)(A) ("[T]he term 'discriminate' in-
cludes--... (5)(A) not making reasonable accommodations to 
the known physical or mental limitations of an otherwise 
qualified individual with a disability who is an applicant or 
employee, unless such covered entity can demonstrate that 
the accommodation would impose an undue hardship on the 
operation of the business of such covered entity."); 42 U.S.C. 
s 12111(9)(B) ("The term 'reasonable accommodation' may 
include--... reassignment to a vacant position.... "). But 
the only adverse decision Aka has cited--the failure to reas-
sign him to the pharmacy technician position--was not a 
refusal to reasonably accommodate Aka's disability. Wash-
ington Hospital accommodated Aka's disability by affording 
him the opportunity to apply for reassignment to the vacant 
position. It accepted his application and interviewed him for 
the opening. There is no reason to doubt that Washington 
Hospital also would have hired Aka had he proved the more 
qualified candidate for the job. As explained earlier, he did 
not. Washington Hospital was under no duty to afford Aka a 
hiring preference--because of his disability--over a more 
qualified, non-disabled applicant. The Congress made clear 
when the ADA was enacted that employers were not expected 
or required to extend such preferences. See H.R. Rep. No. 
101-485, pt. 2, at 56 (1990) ("[T]he employer would be permit-
ted to reject the applicant with a disability and choose the 
other applicant for reasons not related to the disability or to 
the accommodation or otherwise not prohibited by this legis-
lation. In other words, the employer's obligation is to consid-
er applicants and make decisions without regard to an individ-


ual's disability, or the individual's need for a reasonable 
accommodation. But, the employer has no obligation under 
this legislation to prefer applicants with disabilities over other 
applicants on the basis of disability."); see also Wernick v. 
Federal Reserve Bank of New York, 91 F.3d 379, 384 (2d Cir. 
1996) ("Congress intended simply that disabled persons have 
the same opportunities available to them as are available to 
nondisabled persons."); Daugherty v. City of El Paso, 56 
F.3d 695, 700 (5th Cir. 1995) ("[W]e do not read the ADA as 
requiring affirmative action in favor of individuals with dis-
abilities, in the sense of requiring that disabled persons be 
given priority in hiring or reassignment over those who are 
not disabled. It prohibits employment discrimination against 
qualified individuals with disabilities, no more and no less."), 
cert. denied, 116 S.Ct. 1263 (1996); cf. Duckett v. Dunlop Tire 
Corp., 120 F.3d 1222, 1225 (11th Cir. 1997) (no duty to 
transfer "where the employer (independent of concerns about 
disability) has a business policy against the pertinent kind of 
transfer."); Dalton v. Subaru-Isuzu Automotive, Inc., 141 
F.3d 667, 679 (7th Cir. 1998) ("[W]e have been unable to find 
a single ADA or Rehabilitation Act case in which an employer 
has been required to reassign a disabled employee to a 
position when such a transfer would violate a legitimate, 
nondiscriminatory policy of the employer."). Accordingly, 
Washington Hospital's refusal to hire Aka over the more 
qualified Valenzuela is not actionable.8

 Finally, the majority would remand for the district court to 
determine the contours of Washington Hospital's right under 
the collective bargaining agreement to reassign Aka as a 
reasonable accommodation and of Aka's right to such an 
accommodation under the ADA. Maj. Op. at 36-37. I have 
no idea how the majority expects the district court to fulfill its 

__________
 8 I find it unnecessary to consider how the collective bargaining 
agreement might affect Washington Hospital's reasonable accom-
modation duty under the ADA both because Aka has not shown 
Washington Hospital was under any such duty and because the 
majority opinion expressly declines to resolve "whether reassigning 
Aka would have been permissible under [the collective bargaining 
agreement], Maj. Op. at 37.

mandate. Having claimed no adverse personnel action other 
than denial of the pharmacy job, and specifically having made 
no claim of wrongful termination, Aka is not in a position to 
argue that failure to accommodate him in some other position 
breached any duty under the ADA. See Marshall v. Federal 
Express Corp., 130 F.3d 1095-98 (D.C. Cir. 1997) ("[F]or 
discrimination (including denial of reasonable accommodation 
to be actionable, it must occur in regard to some adverse 
personnel decision or other term or condition of employ-
ment.") (emphasis original). And the majority has failed to 
fill in the gap. Further, given that the Congress did not 
intend to establish a preference regime under the ADA, I 
cannot accept the majority's suggestion that reasonable ac-
commodation requires that a disabled person be transferred 
to any open position for which he is qualified (such as the 
pharmacy technician position here), regardless of other appli-
cants' qualifications, so long as the reassignment does not 
impose "undue hardship" on the employer. See Maj. Op. at 
36-37.9

 For the preceding reasons I would affirm the district 
court's summary judgment in toto. I therefore dissent.

__________
 9 The majority, while eschewing express endorsement of prefer-
ences, nonetheless appears to adopt the position, urged by Amicus 
Curiae Equal Employment Opportunity Commission in its brief, see 
Brief of Amicus Curiae at 22-23, that such a preference is what the 
ADA envisions. Otherwise, the majority's discussion of reasonable 
accommodation is irrelevant.

 Silberman, Circuit Judge, with whom Williams and 
Ginsburg, Circuit Judges, join, dissenting: I join Judge 
Henderson's opinion, but wish to make a few brief additional 
comments. With respect to the first issue in the case, there 
really is a rather stark difference between the majority's 
approach and that of the Second Circuit in Fisher v. Vassar 
College, 114 F.3d 1332 (2d Cir. 1997) (en banc), cert. denied, 
118 S.Ct. 851 (1998). To be sure, both the majority and the 
Second Circuit en banc opinion purport to take a middle 
ground. Compare Maj. Op. at 13 (emphasis added) ("[I]n 
some instances ... the fact that there are material questions 
as to whether the employer has given the real explanation will 
not suffice to support an inference of discrimination."); with 
Fisher, 114 F.3d at 1333 (emphasis added) ("[E]vidence con-
stituting a prima facie case prior to the employer's proffer of 
a reason, coupled with the error or falsity of the employer's 
proffered reason may--or may not--be sufficient to show 
illegal discrimination by a preponderance of the evidence.").

 But a middle ground--where a plaintiff "in some instances" 
does, and "in some instances" does not, survive summary 
judgment merely by undermining the employer's proffered 
reason--is an illusion. The truth is that the majority's hold-
ing ineluctably devolves into the "pretext-only" approach 
earlier embraced by the panel and by several of our sister 
circuits, see, e.g., Aka v. Wash. Hosp. Ctr., 116 F.3d 876, 881 
(D.C. Cir. 1997); Sheridan v. E.I. DuPont de Nemours & Co., 
100 F.3d 1061, 1066-72 (3d Cir. 1996) (en banc); Anderson v. 
Baxter Healthcare Corp., 13 F.3d 1120, 1123-24 (7th Cir. 
1994). That becomes apparent when one scrutinizes the 
scenarios offered by the majority to reassure us that a 
plaintiff who discredits an employer's proffered reason will 
not always survive summary judgment.

 The majority's first scenario is "a case in which the plaintiff 
calls the employer's explanation into question, but does so in 
a way that conclusively demonstrates that the real explana-
tion for the employer's behavior is not discrimination, but 
some other motivation"--what might be called the plaintiff-
shooting-himself-in-the-foot scenario. Maj. Op. at 12. As an 
example, the majority points us to a situation where the 


plaintiff had claimed that he had been fired because of his 
age. When his employer proffered a number of nondiscrimi-
natory explanations, including the plaintiff's insubordination, 
the plaintiff responded with evidence that in fact the real 
reason he had been discharged was that he had discovered 
that his employer was violating Securities and Exchange 
Commission rules and the employer wished to cover this 
problem up; in so responding, the plaintiff undermined his 
own claim of age discrimination. See Maj. Op. at 12-13 
(citing Rothmeier v. Investment Advisers, Inc., 85 F.3d 1328 
(8th Cir. 1996)). The majority thus assures us, rebutting an 
employer's proffered reason is not invariably enough: this 
"class" of plaintiffs will continue to be weeded out at the 
summary judgment stage. But it should be obvious that this 
hypothetical--although it once arose--is a sport; a plaintiff's 
lawyer cannot be expected to put on such self-destructive 
evidence.

 The majority's second scenario is "a case in which a plain-
tiff has created only a weak issue of ... fact as to whether 
the employer's explanation is untrue, and there is abundant 
independent evidence in the record that no discrimination has 
occurred." Maj. Op. at 13. The majority explains that "inde-
pendent evidence ... that no discrimination has occurred" 
might include whether the hiring officer belonged to the same 
protected class as the plaintiff or whether the employer has a 
strong record of equal opportunity employment. See id. 
This hypothetical betrays the majority's misunderstanding of 
the requisite burden of proof in a Title VII case. The 
majority implicitly requires the employer to produce, in sup-
port of its summary judgment motion, "abundant independent 
evidence ... that no discrimination has occurred."1 That 
approach is inconsistent with the McDonnell Douglas frame-

__________
 1 To be sure, a Fed. R. Civ. P. 56(c) movant does bear the 
burden of demonstrating that there is "no genuine issue as to any 
material fact." See Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 
(1970); Rodway v. United States Dep't of Agriculture, 482 F.2d 722, 
727 (D.C. Cir. 1973). Here, the employer met that burden by 
pointing out that the plaintiff admitted in his deposition that he had 
no evidence for asserting that his alleged disability was a factor in 

work because it places the burden of persuasion on the 
defendant. As the Supreme Court made clear in Hicks, once 
the employer produces a legitimate nondiscriminatory reason 
for the challenged decision, the presumption that the employ-
er discriminated "drops out of the picture" and the plaintiff 
"at all times bears the burden of persuasion." St. Mary's 
Honor Ctr. v. Hicks, 509 U.S. 502, 511 (1993) (citations and 
internal quotation marks omitted). I agree that "independent 
evidence" is crucial at the summary judgment stage. But it 
is independent evidence of discrimination put forth by the 
plaintiff, not--as the majority suggests--independent evi-
dence of non-discrimination put forth by the defendant.

 In practical application, then, the majority's position prom-
ises that plaintiffs will "routinely," Maj. Op. at 11, be able to 
get to juries based on a collateral issue without ever really 
showing evidence of discrimination--what amounts, de facto, 
to a broad "wrongful discharge" cause of action for a plaintiff 
in a protected class.

 As noted, the Second Circuit, like the majority, appeared to 
claim that it too was adopting a middle ground by saying that 
"the falsity of the employer's proffered reason may--or may 
not--be sufficient to show illegal discrimination by a prepon-
derance of the evidence," 114 F.3d at 1333, and later that 
"[t]he sufficiency of a finding of pretext to support a finding 
of discrimination depends on the circumstances of the case," 
id. at 1338. At the end of the day, however, when one looks 
at the holding rather than general language, the Second 
Circuit diverges from the majority in this case. The en banc 
court left intact the Second Circuit panel's holding that the 
district court committed clear error in concluding--based 
solely on a finding that the university's proffered non-
discriminatory reasons were pretextual--that the real reason 
for the challenged tenure decision was discrimination. See id. 
at 1347. By contrast, the majority here holds that appellant 

__________
the decision not to hire him. See Washington Hospital Center's 
Statement Of Material Facts As To Which There Is No Genuine 
Issue, p 29 at 10 [J.A. 22] (citing Plaintiff Tr. 105-106).


Aka should have survived summary judgment merely because 
he created a jury question as to whether the employer's 
explanation for not hiring him was false. See Maj. Op. at 30. 
Thus, in the Second Circuit, a plaintiff will lose on summary 
judgment unless he presents independent evidence of discrim-
ination, while in our circuit, a plaintiff will survive summary 
judgment merely by putting in issue the employer's proffered 
nondiscriminatory explanation.

 I think the Second Circuit's actual holding, which accords 
with the position adopted by the First and Fourth Circuits, 
see Hidalgo v. Overseas Condado Ins. Agencies, Inc., 120 
F.3d 328, 337 (1st Cir. 1997); Vaughan v. MetraHealth Cos., 
Inc., 145 F.3d 197 (4th Cir. 1998), is faithful to the notion that 
the McDonnell Douglas prima facie case is only a burden of 
production shifting device and really has minimal probative 
value. If an employer meets its burden of producing a 
nondiscriminatory explanation, then it will not do for the 
plaintiff simply to rebut that explanation. To survive sum-
mary judgment, the plaintiff must always produce indepen-
dent evidence of discrimination. Only if we require such a 
showing do we preserve the plaintiff's congressionally-
mandated burden to show that the employer's real reason for 
its personnel decision was discrimination on the basis of the 
plaintiff's membership in a protected class.

 * * * *

 Turning to the reasonable accommodation claim, a prelimi-
nary point is in order. The majority asserts that this issue is 
not properly before us. See Maj. Op. at 37-38 ("Although 
under our normal procedures we would not consider [the 
issue] because [it] was not raised in the district court and 
[was] not within the scope of this court's grant of in banc 
review, in deference to our dissenting colleagues we will 
respond briefly."). If the majority were to follow our "nor-
mal procedures," however, plaintiff's claim would not be 
before the court at all. As Aka's counsel conceded at oral 
argument, Aka never (i.e., neither before the district court, 
the panel, nor the court en banc) connected his reasonable 


accommodation claim to any personnel decision or job oppor-
tunity, as he is required to do under Marshall v. Federal 
Express Corp., 130 F.3d 1095, 1099 (D.C. Cir. 1997). Even 
though Marshall would not be controlling in an en banc, the 
majority does not overrule it or even cite it. Thus, it is the 
majority that has done Aka's pleading work for him at this 
late hour by tying Aka's reasonable accommodation claim to 
the specific pharmacy technician position. I also find puz-
zling the majority's assertion that the reasonable accommoda-
tion issue was not within the scope of our grant of en banc 
review. Question two of our order granting en banc review 
asked:

 Does a collective-bargaining agreement that permits a 
 disabled employee to be reassigned to a vacant position 
 if, in the "sole discretion" of the employer, the reassign-
 ment is "feasible" and "will not interfere with patient 
 care or the orderly operation" of the workplace incorpo-
 rate a different standard than that of the Americans with 
 Disabilities Act, which requires that a disabled employee 
 be reassigned to a vacant position if doing so would not 
 impose an "undue hardship"?

Order, No. 96-7089 (Jan. 30, 1998). Before one is able to 
compare the standard of the ADA with that of the collective-
bargaining agreement, one must first ascertain the standard 
of the ADA itself. Thus, analysis of the scope of an employ-
er's obligation to make reasonable accommodations by "reas-
sign[ing a disabled employee] to a vacant position," 42 U.S.C. 
s 12111(9)(B) (1994), is clearly within the scope of our order 
granting en banc review.

 Although the majority's discussion of Aka's reasonable 
accommodation claim obscures its relationship to his basic 
claim, it should be obvious that if Aka's disparate treatment 
claim survives the employer's summary judgment motion and 
the jury returns a verdict for Aka on this claim, then his 
reasonable accommodation claim is redundant. Only if Aka 
loses on his disparate treatment claim could the reasonable 
accommodation claim become meaningful. But that necessar-
ily means that the reasonable accommodation claim--recall 


that the contended-for reasonable accommodation is reassign-
ment to a vacant position--requires more of the employer 
than the disparate treatment claim, which merely relies on an 
antidiscrimination rule. That is, on Aka's (and the majority's) 
view, the reasonable accommodation claim mandates that the 
employer grant a preference to disabled employees over non-
disabled employees in filling vacant positions.

 I think the majority's reading of the ADA is simply wrong. 
The majority overemphasizes the dictionary definition of the 
word "reassign" and declines to read "reassignment to a 
vacant position" in the context of the other types of reason-
able accommodation listed in 42 U.S.C. s 12111(9). Those 
examples share the common theme of regulating the relation-
ship of the disabled employee vis--vis the employer, making 
no mention of the disabled employee's rights vis--vis other 
non-disabled employees or applicants--that is, none even 
alludes to the possibility of a preference for the disabled over 
the non-disabled. The first type of reasonable accommoda-
tion, "making existing facilities used by employees readily 
accessible to and usable by individuals with disabilities," 
imposes an obligation on the employer but has no immediate 
impact on non-disabled employees. Likewise, "job restruc-
turing" and "part-time or modified work schedules" involve 
accommodations made to the disabled employee in his current 
position and thus have no direct effect on non-disabled em-
ployees or applicants. And the "acquisition of equipment or 
devices, appropriate adjustment or modifications of examina-
tions, training materials or policies, the provision of qualified 
readers or interpreters, and other similar accommodations for 
individuals with disabilities," 42 U.S.C. s 12111(9)(B), may 
impose costs on the employer, but work no harm on non-
disabled employees. In short, all of these sorts of reasonable 
accommodation deal with the relationship between the dis-
abled employee and the employer, and have no direct impact 
on the situation of non-disabled employees or applicants.

 If the Congress had intended to grant a preference to the 
disabled--a rather controversial notion--it would certainly 
not have done so by slipping the phrase "reassignment to a 
vacant position" in the middle of this list of reasonable 


accommodations. Indeed, the catch-all "and other similar 
accommodations for individuals with disabilities," 42 U.S.C. 
s 12111(9)(B) (emphasis added), strongly indicates that the 
Congress perceived each of the enumerated types of reason-
able accommodation to be of the same character. If "reas-
signment to a vacant position" is read in context, therefore, it 
must mean that an employer is obligated--if another type of 
reasonable accommodation cannot be made in the disabled 
employee's current position--to allow a disabled employee to 
compete (on equal terms with non-disabled employees) for 
vacant positions. On this understanding of "reassignment to 
a vacant position," the phrase fits in with the common theme 
of regulating the relationship between disabled employee and 
employer without directly affecting non-disabled employees. 
This reading accords with the House Report's recognition 
that "the employer's obligation is to consider applicants and 
individuals without regard to an individual's disability, or the 
individual's need for a reasonable accommodation. But, the 
employer has no obligation under this legislation to prefer 
applicants with disabilities over other applicants on the basis 
of disability." H.R. Rep. No. 485(II), 101st Cong., 2d Sess., 
at 56 (1990) (emphasis added).

 Contrary to the majority's assertion, this interpretation of 
the statute does not render the "reassignment to a vacant 
position" phrase a "nullity." Maj. Op. at 41. I read that 
provision as designed to prevent an employer from as a 
matter of policy--either blanket or ad hoc--forbidding em-
ployees, including disabled ones, from applying for other 
positions. See H.R. Rep. No. 485(II), 101st Cong., 2d 
Sess., at 58 ("[I]t would be a violation for an employer to 
adopt ... a presumption that no individual with a disability 
would be interested in moving into a particular job.").